UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


JANET LARSON,                                              CIVIL NO. 07-3548 (JRT/JSM)

              Plaintiff,

v.                                                         REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

JANIE S. MAYERON, United States Magistrate Judge

       The above matter is before the undersigned United States Magistrate Judge on

plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's Motion for

Summary Judgment [Docket No. 15].  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation by the District Court pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

       For the reasons discussed below, it is recommended that plaintiff's Motion for

Summary Judgment [Docket No. 12] be GRANTED in part, and defendant's Motion for

Summary Judgment [Docket No. 15] be DENIED.

## I.      PROCEDURAL BACKGROUND

       Plaintiff protectively applied for Disability Insurance Benefits under Title II of the

Social Security Act, 42 U.S.C. §§ 401 et seq. on February 3 and September 27, 2004.

(Tr. 92).  Plaintiff alleges a disability, beginning June 13, 2002, due to severe neck and

back strain, depression, anxiety/panic attacks, left arm rotator cuff tear/decompression,

right arm epicondylitis[1] and headaches.  (Tr. 126).  The Social Security Administration

---

[1]      Epicondylitis: Inflammation of an epicondyle, which is defined as a projection
from a long bone near the articular extremity above or upon the condyle, which is

("SSA") denied plaintiff's application initially and upon reconsideration.   (Tr. 55-62).

Plaintiff then filed a request for a hearing and on August 31, 2006, a hearing was held

before Administrative Law Judge (ALJ) David K. Gatto.  (Tr. 32, 445-470).  On October

11, 2006, the ALJ issued a decision to deny plaintiff benefits.  (Tr. 32-39).  Plaintiff

requested review from the Appeals Council.  (Tr. 27).  On March 23, 2007, the Appeals

Council denied her request for review.   (Tr. 21-24).   On June 22, 2007, plaintiff

requested the Appeals Council reopen and remand due to new and material evidence

and error of law.  (Tr. 10).  On July 13, 2007, the Appeals Council found no reason to

reopen and change the decision.   (Tr. 6).   Denial of review by the Appeals Council

made the ALJ's decision the final decision of the Commissioner in this case.  (Tr. 21).

See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court

pursuant to 42 U.S.C. § 405(g).  [Docket No. 1].  The parties now appear before the

Court on plaintiff's Motion for Summary Judgment [Docket No. 12] and defendant's

Motion for Summary Judgment [Docket No. 15].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability

benefits may be awarded.   "The Social Security program provides benefits to people

who are aged, blind, or who suffer from a physical or mental disability."   42 U.S.C.

§ 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).  The Social Security

Administration shall find a person disabled if the claimant "is unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

---

defined as a rounded articular surface at the extremity of a bone.  Stedman's Medical
Dictionary, 27th Ed. (2000).

impairment." 42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least 12 months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment.  If so, the claimant is not disabled.  If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.  If not, the claimant is not disabled.  If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled.  The fourth step asks if the claimant's impairments prevent [him] from doing past relevant work.  If the claimant can perform past relevant work, [he] is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent [him] from doing other work.  If so, the claimant is disabled.

Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994).

**B.    Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1492.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.    Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id. In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant

5

has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.   The ALJ's Findings of Fact

Plaintiff, born July 31, 1959, was 47 years old on the date of the ALJ's decision. (Tr. 92). Plaintiff has past relevant work experience as a registered nurse and secretary. (Tr. 37, 144). Plaintiff has alleged disability due to severe neck and back strain, depression, anxiety/panic attacks, left arm rotator cuff tear/decompression, right arm epicondylitis and headaches. (Tr. 126).

The ALJ concluded that plaintiff was not entitled to a period of disability or disability insurance benefits under sections 216(i) and 223 of the Social Security Act. (Tr. 32). The ALJ stated that he made the following findings based on the entire record:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2. The claimant has not engaged in substantial gainful activity since June 13, 2002, the alleged onset date (20 CFR 404.1520(b) and 404.1571 et seq.).

3. The claimant has the following severe impairments: lumbosacral[2] strain and degenerative disc disease of the cervical spine; left shoulder tendon tear, status post left shoulder surgical repair; depression; chronic pain syndrome; and degenerative joint disease of the left knee, status post arthroscopy (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

---

[2]   Lumbosacral:   Relating to the lumbar vertebrae and the sacrum.   See www.stedmans.com.

5.      The claimant has the residual functional capacity to perform light work or lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk or sit for 6 hours in an 8-hour workday.   Additional limitations include occasional stopping, kneeling and reaching overhead.   The claimant cannot perform any crouching or crawling, working at unprotected heights or with dangerous moving machinery. She cannot perform constant fine or gross manipulation, or constant neck, flexion, rotation or extension.  With regard to mental limitations, the claimant is limited to brief and superficial contact with the public, co-workers and supervisors and is limited to unskilled, entry-level work.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on July 31, 1959 and was 42-years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

10.     The claimant has not been under a "disability," as defined in the Social Security Act, from June 13, 2002 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 34-39).

## B.      The ALJ's Application of the Five-Step Process

In reaching his findings, the ALJ made the following determinations under the five-step procedure.  (Tr. 32-39).  At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.  (Tr. 34).

At the second step, the ALJ found that plaintiff was subject to severe impairments of lumbosacral strain and degenerative disc disease of the cervical spine; left shoulder tendon tear, status post left shoulder surgical repair; depression; chronic

pain syndrome; and degenerative joint disease of the left knee, status post arthroscopy. (Tr. 34).

At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (Tr. 35). At the fourth step, the ALJ found that plaintiff could not perform her past relevant work. (Tr. 37). At the fifth step, the ALJ determined that plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and therefore, found plaintiff to be "not disabled." (Tr. 39).

## IV.    ISSUES UNDER REVIEW

On appeal, plaintiff first contended that the ALJ's credibility finding was not supported by substantial evidence in the record as a whole and did not comply with the requirements of law. Pl. Mem., pp. 28-34. Second, plaintiff argued that the opinions of plaintiff's treating physician were not given the weight required by law. Id., pp. 34-38. Finally, plaintiff maintained that the ALJ's hypothetical question to the vocational expert did not accurately describe her limitations. Id., p. 38-39. In her motion for summary judgment, plaintiff asked this Court to reverse the ALJ's decision and award benefits. In his cross-motion for summary judgment, the Commissioner asked this Court to deny plaintiff's motion for summary judgment and affirm the decision of the Commissioner denying plaintiff's claims for disability benefits.

## V.    DISCUSSION

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  It is the claimant's burden, not the Commissioner's, to prove the RFC.  Id. at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).  In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  Id.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  That said, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'"  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)).  The ALJ is not limited to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional."  Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).  If necessary, the ALJ should solicit opinions from claimant's treating physicians, or seek consultative examinations to help assess claimant's RFC. Nevland, 204 F.3d at 858.

Plaintiff essentially contends that the ALJ's residual functional capacity findings were not supported by substantial evidence in the record as a whole.  The Commissioner disagrees, arguing that the record as a whole supports the ALJ's RFC finding.

### A.    The Record

### 1.    Physical Health Medical Records

Plaintiff was a registered nurse and licensed practical nurse who had worked at Miller-Dwan Medical Center and St. Mary's/Duluth Clinic. (Tr. 362, 386).  On June 13, 2002, she was a passenger in a motor vehicle crash which was rear-ended by another

vehicle.  (Tr. 243, 248).  The car she was travelling in was going approximately 50 to 55 miles per hour; the car that hit her vehicle was traveling at an estimated speed of 80-100 miles per hour.  (Tr. 243, 248, 411).  At the time of the crash, plaintiff developed immediate neck discomfort.  (Tr. 243).  Dr. Peter Stenehjem at St. Luke's Emergency Department noted that plaintiff had mild diffuse point tenderness to the cervical spine, spasm to the paraspinous[3] musculature, spasm and tenderness to the left sternocleidomastoid[4] muscle, and her back was otherwise not tender.  (Tr. 243).  A C-spine lateral and C-spine series were performed, and Dr. Stenehjem did not see any acute fracture, dislocation, or soft tissue swelling, although decreased disk height was noted between C5 and C6, and there were degenerative changes between C5, C6, and C7 with early osteophyte formation posteriorly.  (Tr. 244).  Plaintiff was given a soft collar, ibuprofen and Lortab[5] orally, and was told to avoid bending, stooping, twisting, or lifting over 15 pounds.  (Tr. 244).  Dr. Stenehjem's assessment was that plaintiff had cervical strain and cervical degenerative joint disease.  (Tr. 244).  Plaintiff was told that the disk height loss between C5 and C6 could be acute or a chronic manifestation of degenerative joint disease.  (Tr. 244).  Plaintiff was also told to support her neck with the soft collar as desired, told to see her doctor with ongoing significant symptoms beyond 7-10 days, and that she could engage in a gentle range of motion activities on a daily basis as tolerated.  (Tr. 244).

---

[3]  Paraspinous: adjacent to the spinal column.  See http://medical.merriam-webster.com/medical/paraspinal.

[4]  Sternocleidomastoid: Relating to sternum, clavicle, and mastoid process.  See www.stedmans.com.

[5]  Lortab is a brand name for a combination of acetaminophen and hydrocodone. See www.nlm.nih.gov/medlineplus/druginfo.

On June 17, 2002, plaintiff saw Dr. Lynn MacLean at Superior Health Medical Group for evaluation of her neck pain after the accident. (Tr. 363). Plaintiff held her head stiffly and was not in acute distress; Dr. MacLean observed excellent muscle strength in plaintiff's arms and legs bilaterally and excellent pincer and interosseus[6] strength. (Tr. 363). Dr. MacLean recommended no work until re-evaluation, and continued her on naproxen[7] and Tylenol. (Tr. 363).

On July 3, 2002, plaintiff returned to Dr. MacLean for reevaluation, and reported occasional episodes of momentary zinging shooting pain down her left arm and occasionally down her left lateral leg to her knee. (Tr. 362). Plaintiff had not noticed any weakness, numbness or tingling sensations, but had developed some discomfort between her shoulder blades and occasional low back discomfort on her left lower back area. (Tr. 362). She had not returned to work as a nurse, as her job required her to lift and move patients. (Tr. 362). Plaintiff continued to hold her head stiffly, and had diminished range of motion to the left and right, though more so to the left; plaintiff also had minimal tenderness in the paravertebral area around the cervical spine around C5, 6 and 7 and tenderness up the left side of her neck. (Tr. 362). Plaintiff was assessed as having neck strain, with gradual improvement, thoracic back pain, likely secondary to rhomboid strain phenomenon, and left leg pain, likely secondary to sciatica from SI (sacroiliac) joint dysfunction. (Tr. 362). Dr. MacLean recommended physical therapy,

---

[6]    Interosseus: Lying between or connecting bones; denoting certain muscles and ligaments. Stedman's Medical Dictionary, 27th Ed. (2000).

[7]    Prescription naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis, and ankylosing spondylitis (arthritis that mainly affects the spine). Prescription naproxen is also used to relieve shoulder pain caused by bursitis or tendinitis. Non-prescription naproxen is used to reduce fever and to relieve mild pain from headaches, muscle aches, arthritis, menstrual periods, the common cold, toothaches, and backaches. <u>See</u> www.nlm.nih.gov/medlineplus/druginfo.

however plaintiff preferred to arrange chiropractic therapy.  (Tr. 362).  Dr. MacLean recommended that plaintiff continue off work and to use heat and ice packs, naproxen or ibuprofen and Extra Strength Tylenol.  (Tr. 362).

On July 3, 2002, plaintiff underwent scans at St. Luke's.  (Tr. 368).  Dr. Dean Rigby determined that there was no evidence of fracture or dislocation in the lumbar spine, no evidence of acute injury involving the lumbar spine, and no evidence of fracture or dislocation or acute injury involving the thoracic spine.  (Tr. 268).

Plaintiff was seen on July 19, 2002 by another doctor at Superior Health Medical Group.  (Tr. 361).  The treatment notes stated that plaintiff's muscle strength was 5/5 on both sides and symmetrical.  (Tr. 361).  Plaintiff's no-work restriction was continued, along with ibuprofen and physical therapy.  (Tr. 361).  Plaintiff was also seen at Polinsky Medical Rehabilitation Center on July 19, 2002 for a physical therapy initial evaluation. (Tr. 411).  Plaintiff reported that her symptoms were slowly getting better and reported her average pain level as a 4-5 out of a 1-10 ascending pain scale.  (Tr. 411).  In this evaluation, plaintiff demonstrated symmetrical range of motion in all planes and noted that her neck felt better when she was looking up; shoulder active range of motion was within normal limits; upper extremity strength testing was 5/5 and painless in all planes, although plaintiff presented tender points along the suboccipital[8] region throughout the bilateral cervical paraspinals and into her levator scapula and upper traps bilaterally. (Tr. 411).  She was assessed as having soft tissue hyper-facilitation following whiplash injury; her rehabilitation potential was indicated as good for stated goals.  (Tr. 411).

---

[8]     Suboccipital: Below the occiput or the occipital bone, defined as a bone at the lower and posterior part of the skull.  See www.stedmans.com.

On August 1, 2002, plaintiff was seen for a follow-up at Superior Health Medical Group.  (Tr. 360).  Plaintiff reported an episode of severe pain in the parascapular which was sharp in nature; she took some Baclofen[9] and the pain improved.  (Tr. 360). Plaintiff continued to take Baclofen as needed for muscle spasms, and felt that it helped, but it made her nauseated.  (Tr. 360).  Plaintiff was assessed as having cervical and scapular muscle strain secondary to the accident, and it was noted that she seemed to be improving slowly.  (Tr. 360).  Plaintiff was given work restrictions for two weeks.  (Tr. 360).

On August 19, 2002, plaintiff was seen by Dr. MacLean for reevaluation of her neck pain and spasms.  (Tr. 359).  Plaintiff was still unable to return to work.  (Tr. 359). She reported pain after carrying a coffee can around to water her plants, and having difficulties after sitting at a computer, performing gardening tasks and on any forward motion.  (Tr. 359).  Plaintiff was told to continue off work.  (Tr. 359).

On August 22, 2002, plaintiff had an MRI of the brain at St. Luke's.  (Tr. 267). Dr. Ekberg determined that the results were normal.  (Tr. 367).  The same day, plaintiff had an MRI of her cervical spine.  (Tr. 365-366).  Dr. Ekberg concluded the plaintiff had severe central canal and intervertebral canal stenosis[10] at the C6-7 level with cord flattening, as well as bilaterally stenotic intervertebral canals on the basis of end plate spurring, broad-based nuclear herniation, and bilateral uncinate spurs; Dr. Ekberg also determined that plaintiff had moderate to severe central canal stenosis at C5-6 with end

---

[9]    Baclofen is a drug which acts on the spinal cord nerves and decreases the number and severity of muscle spasms caused by multiple sclerosis or spinal cord diseases.  It also relieves pain and improves muscle movement.  See www.nlm.nih.gov/medlineplus/druginfo.

[10]   Stenosis: A stricture of any canal or orifice.  See www.stedmans.com.

plate spurs, uncinate spurs, and broad-based nuclear herniation, with moderate cord flattening with moderate to severe central canal stenosis; there was also moderate central canal stenosis at C3-4 with mild flattening of the cord.  (Tr. 366).

On September 12, 2002, plaintiff was seen by Dr. William Himango at the Duluth Neurosurgical Institute at the request of Dr. MacLean.  (Tr. 248).  Plaintiff stated that since the time of the accident she had experienced left arm pain which she described as both pulsatile (throbbing) and shooting, extending from the shoulder to the elbow, and had similar experiences involving her left lower leg, primarily her lateral and medial thigh.  (Tr. 248).  She had occasional discomfort in her right leg.  (Tr. 248).  Plaintiff also noticed numbness in both hands when driving an automobile, which she stated may be secondary to squeezing the wheel too hard.  (Tr. 248).  She informed Dr. Himango that her neck felt tired when performing activities such as reading a newspaper and that she did not believe she could lead a normal lifestyle because of her discomfort.  (Tr. 248).  Physical therapy did not provide relief.  (Tr. 248).

Upon examination, Dr. Himango noted that plaintiff's gait, heel to toe walking, lumbar range of motion, cervical range of motion, and motor and sensory testing were all normal.  (Tr. 249).  Reflexes were generally hypoactive and symmetric.  (Tr. 249).  Plaintiff's cervical MRI scan demonstrated the degenerative changes at C3-4 and C5-6 and C6-7 levels, which Dr. Himango found to be long-standing and most likely not attributable to the motor vehicle accident.  (Tr. 249).  Plaintiff did not have significant cord distortion.  (Tr. 249).  Dr. Himango noted that plaintiff was not a candidate for surgical intervention, and that she could continue physical therapy if she experienced symptomatic relief.  (Tr. 249).  Additionally, Dr. Himango stated that plaintiff could return to work at any time when she felt able to do so.  (Tr. 249).

Dr. MacLean reevaluated plaintiff on September 13, 2002. (Tr. 358). Plaintiff reported that she had been increasing her activities at home and was able to carry approximately 2 ½ gallons of grain, which was equivalent to ten to fifteen pounds, and had been walking daily. (Tr. 358). Plaintiff continued to hold her neck stiffly and had palpable tenderness para-vertebrally along the cervical spine; her strength appeared intact in her biceps and triceps. (Tr. 358). Dr. MacLean directed plaintiff to continue off work and continue physical therapy. (Tr. 358).

On September 24, 2002, plaintiff's physical therapy progress was evaluated by Geri Pietrowski, Physical Therapist.[11] (Tr. 409-410). Plaintiff had received thirteen treatment sessions. (Tr. 409). Plaintiff felt that therapy had improved her mobility but her pain remained the same. (Tr. 409). Plaintiff had gradually increased her activity level and was able to do more with increased pain, yet her pain remained an average of about 7 on a 0-10 pain scale. (Tr. 409). Plaintiff was able to lift up to 20-25 pounds and had resumed more of activities around the house. (Tr. 409). Plaintiff still had increased muscle tightness throughout the cervical paraspinals along with upper trapezius muscles and interscapular muscles. (Tr. 409). Plaintiff reported a 40% reduction in pain while driving, but reported a decrease of not more than 25% in her pain although her activity level had increased. (Tr. 410).

On October 7, 2002, plaintiff was treated by Dr. MacLean. (Tr. 357). Plaintiff was having success with an electric stimulator at home, and continued to have spasms and limited movement most of the time. (Tr. 357). Plaintiff was using Baclofen, which she felt helped with the spasms. (Tr. 357). Plaintiff reported that she was encouraged by her increasing ability to work at the farm -- she was able to lift ¾ of a 5-gallon bucket

---

[11]     The date noted as being the Progress Evaluation Date is September 24, 2002; however, the signature of Geri Pietrowski is dated as October 9, 2002.

of grain and was gradually increasing her activities.  (Tr. 357).  Dr. MacLean also indicated that plaintiff was encouraged to return to work as originally planned the following week, without restrictions.  (Tr. 357).  Dr. MacLean stated that plaintiff worked part-time and planned to limit herself to only two days in a row.  (Tr. 357).  Plaintiff was instructed to continue with physical therapy and with the home electrical stimulation treatment, and was told she could return to work without restriction as of October 14, 2002.  (Tr. 357).  Later that day, plaintiff called Dr. MacLean to speak to her about restrictions for work; the plaintiff stated that her physical therapist's recommendations were for returning to work October 21, 2002 with no transfers of patients, no lifting over 10 pounds, no lifting over five pounds above shoulders, no repetitive twisting and turning.  (Tr. 356-357).

On November 22, 2002, plaintiff was seen by Dr. Erlemeier at the St. Mary's/Duluth Clinic at the request of Dr. MacLean for evaluation of ongoing neck pain.  (Tr. 281).  Plaintiff reported some new numbness and tingling of the index and middle fingers for the past one-and-a-half months.  (Tr. 281).  Plaintiff also reported significant pain on the top of the shoulders, and some left shooting pain into the upper arm, and new pain in the right shoulder from the right neck into the right upper extremity just above the elbow.  (Tr. 281).  Plaintiff had no weakness, but there was fatigue, and reported shooters on top of her shoulders at times, especially during her physical therapy or if she was carrying too heavy of a grain bucket or ice cream bucket.  (Tr. 281).  Plaintiff's medications at the time were Serzone,[12] Baclofen, Naprosyn,[13]

---

[12]   Serzone is a brand name for Nefazodone, which is used to treat depression. See www.nlm.nih.gov/medlineplus/druginfo.

[13]   Naprosyn is a brand name for prescription naproxen, which is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a

Extra-Strength Tylenol, and Motrin.  (Tr. 281).  Plaintiff's neck was noted as supple with full range of motion, and she had normal strength, bulk and tone in all four extremities. (Tr. 282).  Dr. Erlemeier assessed plaintiff as having degenerative joint disease with moderate severe cervical spinal stenosis at least two levels, cervical neck pain and strain after the motor vehicle accident, and numbness in her right index and middle fingers not prior to the accident.  (Tr. 282-283).  Plaintiff was started on Pamelor,[14] and instructed to continue physical therapy with heat ultrasound massage and to include daily exercise.  (Tr. 283).

On November 26, 2002, plaintiff's physical therapy was reviewed by Dick Eilert, Physical Therapist.[15]  (Tr. 407-408).  Plaintiff was being treated once to twice per week, with treatment including electrical stimulation, cervical traction, myofascial stretching, spinal mobilization, ultrasound, range of motion and strengthening exercises, and instruction in a progressive home exercise program.  (Tr. 407).  The review noted partial success with symptom resolution, continued cervical and thoracic paraspinal muscle tightness on the right, moderate tightness noted at the pectoralis and latissiumus muscles bilaterally.  (Tr. 407).  Plaintiff reported continued limitation of activity tolerance, with recurrent significant pain of upper back and neck and headaches with attempts at

---

breakdown of the lining of the joints), rheumatoid arthritis (arthritis caused by swelling of the lining of the joints), juvenile arthritis (a form of joint disease in children), and ankylosing spondylitis (arthritis that mainly affects the spine).  See www.nlm.nih.gov/medlineplus/druginfo.

[14]    Pamelor is a brand name for nortriptyline, which is used to treat depression. See www.nlm.nih.gov/medlineplus/druginfo.

[15]    The date noted as being the Progress Evaluation Date is November 26, 2002; however, the signature of Dick Eilert is dated as December 18, 2002.

activity progressions or prolonged postures.  (Tr. 407).  Plaintiff increased her mobility to approximately 60% of normal, with a reduction in pain with driving.  (Tr. 408).

On December 4, 2002, plaintiff was seen by Dr. MacLean for revaluation of her neck.  (Tr. 355-356).  Plaintiff reported that she had unsuccessfully attempted to work with restrictions of no more than ten pounds lifting, no over the shoulder work over five pounds, no patient transfers and no repetitive twisting or turning activities.[16]  (Tr. 356).  Plaintiff had noticed increased tightening in her back muscles and constant pain in her back.  (Tr. 356).  She had been working on her stretching exercises and had continued with her physical therapy.  (Tr. 356).  At home, plaintiff's activities of daily living included carrying a 10-15 pound bucket of grain for 25 feet, resting, and carrying it 20 more feet; she was able to accomplish this although continued to have pain following the activity.  (Tr. 356).  Plaintiff was unable to read a book for more than five or ten minutes with her head tilted forward due to increased neck pain and upper back spasms.  (Tr. 356).  Plaintiff performed and carried small loads of laundry, she vacuumed for short periods of time, and noticed increased pain when decorating the house for Christmas the previous week.  (Tr. 356).

On examination, Dr. MacLean observed that plaintiff appeared quite stiff sitting in the chair and continued with palpable tenderness across the upper back, and tenderness was noted into the occiput in the back.  (Tr. 356).

---

[16]    Dr. MacLean explained that at her last evaluation of plaintiff on October 7, 2002, she and plaintiff had discussed plaintiff being released to work with restrictions, but that Dr. MacLean had given plaintiff a note that she could return to work without restrictions because plaintiff feared she would lose her job.  (Tr. 356).  However, within an hour, plaintiff contacted Dr. MacLean as a result of the physical therapist's recommendation that plaintiff return to work only with restrictions, and thus, plaintiff was placed on the above work restrictions.  (Tr. 356).

Dr. MacLean assessed plaintiff as having cervical pain radiating up to the shoulders with paresthesias[17] in the right arm, exacerbated by a motor vehicle accident on June 3, 2002.  (Tr. 356).  She continued plaintiff's Baclofen, Motrin and Tylenol, and also continued her work restrictions with no above-the-shoulder work regardless of weight.  (Tr. 356).

On January 26, 2003, plaintiff's physical therapy was reviewed by Dick Eilert, PT.[18]  (Tr. 405-406).  Plaintiff was being treated once to twice per week, with treatment including electrical stimulation, cervical traction, myofascial stretching, spinal mobilization, ultrasound, range of motion and strengthening exercises, and instruction in a progressive home exercise program.  (Tr. 405).  Plaintiff reported good partial relief of recurrent symptoms and a gradual increase of home activity tolerance generally but with continued persistent recurrent exacerbation of upper back and neck pain.  (Tr. 405).  Plaintiff reported approximately 50% decrease of pain level when doing general household chore activities.  (Tr. 406).

In February of 2003, plaintiff saw chiropractor Terese Tomanek, D.C.  (Tr. 263-268).  Plaintiff's case history form indicates that since the accident, her neck pain had gotten much better, but that she still had shoulder blade and right arm pain.  (Tr. 268).  Plaintiff also indicated that she was currently on medical leave from work, and was unable to perform her normal household duties.  (Tr. 268).  Dr. Tomanek took plaintiff's case history and noted that plaintiff had occasional shooting pain, and that the week prior, plaintiff's posterior elbow was so painfully she dropped a bowl.  (Tr. 267).  Dr. Tomanek also noted that plaintiff only slept well one or two nights per week, that her

---

[17]  Paresthesias: sensory loss; tingling and numbness; loss of sensation.  See http://www.nlm.nih.gov/medlineplus/ency/.

[18]  The date noted as being the Progress Evaluation Date is January 26, 2003; however, the signature of Dick Eilert is dated as March 24, 2003.

neck pain was always present, that she had upper back spasms, and difficulty taking a deep breath since the accident. (Tr. 266). Dr. Tomanek's notes state that plaintiff was lifting 30 to 35 pounds and going fifty feet to feed animals, which aggravated her pain by the end of the day. (Tr. 266). Plaintiff graded her pain as previously "severe" in her neck, between the shoulders, in her shoulders, and in her arms, elbows or hands, but that it was currently graded as "moderate." (Tr. 263). Thereafter, plaintiff was treated by various chiropractors at the Superior Health Medical Group in Duluth, Minnesota on a regular basis through January of 2004. (Tr. 251-268). The notes from these sessions reflected complaints by plaintiff of pain, spasms, soreness, swelling, and throbbing concerning her neck, shoulder, and right arm, and various treatments, including traction therapy, home traction unit, cortisone injections, and acupuncture. (Tr. 251-262).

On February 5, 2003, plaintiff was seen by Dr. MacLean for re-evaluation of her neck. (Tr. 354). Plaintiff reported increased range of motion although she noticed severe headaches after deep massages. (Tr. 354). Plaintiff had been testing the amount of weight she could carry to the horses and was able to carry 25-30 pounds short distances, and believed she would be capable of lifting 10-20 pounds for brief moments above the height of her shoulders. (Tr. 354). Dr. MacLean reduced plaintiff's work restrictions, and increased the weight restriction to 30 pounds of overhead lifting, over the shoulder lifting to 20 pounds, and recommended no frequent twisting or turning activities. (Tr. 354).

On March 19, 2003, Dr. Tomanek sent Dr. MacLean a letter informing her that she was sending plaintiff's records, x-rays and MRI to Dr. Robert Donley to obtain a second opinion and to decide if plaintiff could be a candidate for surgery. (Tr. 259).

Dr. Tomanek's letter indicated that she agreed with the work restrictions that had been imposed by Dr. MacLean.  (Tr. 259).

On April 4, 2003, plaintiff was seen by Dr. MacLean, who noted that Dr. Donley did not feel that the MRI was conclusive as to surgical treatment recommendations. (Tr. 354).   Plaintiff also reported to Dr. MacLean increased pain in her right medial elbow, especially with motions such as pinching her fingers together and pain and weakness in the right arm to the point that she could drop plates.  (Tr. 354).  Plaintiff's current work restrictions were continued.  (Tr. 353).

On May 19, 2003, Dr. Tomanek sent Dr. Janus Butcher a letter referring plaintiff to him for care.  (Tr. 255).  The letter stated that plaintiff continues to be unable to work because of extreme neck and right arm pain.  (Tr. 255).

Plaintiff was seen by Dr. Butcher for right arm pain at the Duluth Clinic on May 23, 2003.  (Tr. 277).  Plaintiff complained of right arm pain that began around February of 2003; the pain was typically worse with gripping or carrying-type activities, and subsided somewhat at rest but worsened when she increased her activities. (Tr. 277).  The pain radiated down the extensor surface of the forearm to about mid-forearm, without numbness, tingling, or dysesthesia[19] associated with it.   (Tr. 277). Dr. Butcher's notes state that plaintiff was gradually making improvement for her neck injury with Dr. Tomanek, and that her hobbies included horses.   (Tr. 277).   Her medications at the time were Serzone, Trazodone,[20] and naproxen sodium.  (Tr. 277).

---

[19]     Dysesthesia: impairment of sensation short of anesthesia (numbness). Stedman's Medical Dictionary, 27th Ed. (2000).

[20]     Trazodone is used to treat depression.  See www.nlm.nih.gov/medlineplus/druginfo.

Plaintiff showed tenderness over the right lateral epicondyle,[21] a positive ECRB challenge test,[22] lacked about 5 degrees of extension on the elbow due to discomfort; with her wrist extended, she managed full extension with good pronation and supination and full motion around the wrist.  (Tr. 277).  Plaintiff was given a corticosteroid injection, which the plaintiff tolerated well, and she was placed in a wrist splint and given orders with physical therapy for her elbow.  (Tr. 278).

On May 28, 2003, physical therapist Eilert prepared a discharge summary regarding the status of plaintiff's physical therapy for the dates of November 26, 2002 through January 13, 2003.  (Tr. 399-400).  Plaintiff reported partial success with symptom control strategies, but with continued recurrent, variable exacerbation of back and neck pain.  (Tr. 399).  She also reported continued limitation of activity tolerances, with recurrent significant pain of upper back and neck and headaches with attempts at activity progression or prolonged postures.  (Tr. 399).  Plaintiff was assessed as having partial resolution of spinal dysfunctions, and slight increase of activity tolerance, but with consistent recurrent exacerbation and inability to return to her level of previous employment.  (Tr. 399).  Plaintiff indicated that she wished to proceed with chiropractic care as alternative treatment at that time.  (Tr. 399).  Plaintiff noted a 30% decrease in pain level associated with turning her head, and a 25-50% decrease of pain associated with household chore activities.  (Tr. 399).

On July 11, 2003, Dr. MacLean saw plaintiff for re-evaluation of severe neck strain and upper back pain.  (Tr. 353).  She noted that plaintiff believed she had

---

[21]     Epicondyle is defined as a projection from a long bone near the articular extremity above or upon the condyle, which is defined as a rounded articular surface at the extremity of a bone.  Stedman's Medical Dictionary, 27th Ed. (2000).

[22]     ECRB stands for Extensor Carpi Radialis Brevis.

continued to gradually improve, although she continued to have severe spasms and sharp shooting pains in the back of her neck whenever she looks down.  (Tr. 353). Plaintiff reported that she was only able to perform minimal gardening, for a maximum of one hour, before she experienced increased pain in her neck.  (Tr. 353).  She was no longer feeding horses, and when she was on jury duty she noticed severe pain in her neck after sitting two hours, taking a short break, sitting for two hours and then having lunch.  (Tr. 353).  Plaintiff stated that she was unable to return to her job in a light duty status and she was looking for a new type of work.  (Tr. 353).  On examination, plaintiff was observed to be sitting very stiffly in her chair, and there was diffuse neck and upper back tenderness.  (Tr. 352).

Plaintiff underwent a functional capacity evaluation over a two-day period with Jeff Kittelson, PT, at the Center for Therapy of Duluth on October 7 and 8, 2003.[23] (Tr. 01-404).  Kittleson noted that in an 8-hour workday, plaintiff could sit, stand and walk for 8 hours.  (Tr. 401).  She was able to continuously forward bend and sit, squat, crawl, crouch, kneel and balance; she could frequently forward bend and stand, climb height, rotate standing; and could only occasionally do overhead work above shoulder level and rotate sitting.  (Tr. 401).  Plaintiff could use both hands for simple grasping, could not use both hands for firm grasping, and could use her right hand, but not left hand, for fine manipulating.  (Tr. 402).

During the evaluation, plaintiff rated her pain at 6 out of 10 on a 0 to 10 scale with activity, with her lowest pain rating typically a 2-3/10 without activity.  (Tr. 403).  Plaintiff noted sensations of pain at light work levels during the exam which increased with

---

[23]    In light plaintiff's comments to Superior Health Medical Group on October 22, 2003, this Court assumes this functional evaluation was requested by an insurance carrier for one of the vehicles involved in plaintiff's motor vehicle accident.  (Tr. 252).

higher work levels; her complaints were at the left shoulder along the upper trapezius as well as the right cervical muscles and upper trapezius area.  (Tr. 403).  Although symptoms were present, they were well under control and no overt pain behaviors were noted during the exam.  (Tr. 403).

Kittleson found that plaintiff's cervical active range of motion was functional but with complaints of pulling with rotational movements left and right as well as side bending left and right.  (Tr. 403).  Discoordination was observed in both hands during hand coordination drills.  (Tr. 403).  Plaintiff demonstrated decreased ability to do rotational movement in sitting.  (Tr. 403).

Kittleson opined that plaintiff's significant abilities were forward bending in sitting, low level activities of squatting, crawling, crouching and kneeling, balance activity, walking, sitting, and standing.  (Tr. 404).  Her significant deficits were overhead work, rotational movement in sitting, fine manipulating hand coordination tasks, and firm grasping was significantly limited.  (Tr. 404).  He concluded that plaintiff fell into the light work category as her maximum levels were 40 pounds with single hand carries. (Tr. 404).

On October 22, 2003, plaintiff reported to Superior Health Medical Group that she had been bad for the past two weeks as a result of the restriction testing she went through for insurance.  (Tr. 252).  She stated she was totally restricted for two weeks after two days of testing.  (Tr. 252).  On October 29, 2003, plaintiff indicated to Superior Health Medical Group that she felt that she had not yet recovered from the functional capacity testing.  (Tr. 252).  On November 14, 2003, plaintiff stated to Superior Health Medical Group that she felt pretty good.  (Tr. 252).

On November 18, 2003, plaintiff was seen by Dr. Butcher at the Duluth Clinic for a follow-up for right elbow pain and a new complaint of left shoulder pain.  (Tr. 275). Plaintiff reported that the cortisone injection she received in May in the right elbow had worked quite well, but she was now noticing recurrence of pain and was having pain with any gripping or lifting activities.  (Tr. 275).  Plaintiff had been doing therapeutic exercises but noticed pain so she had to stop.  (Tr. 275).  Her examination showed normal range of motion in the neck, tenderness in the anterolateral aspect of the left shoulder, positive impingement signs and some pain with resisted external rotation. (Tr. 275).  Her right elbow showed tenderness over the lateral epicondyle, pain with resisted extension of the wrist, normal motion in the wrist and elbow and normal motor function of both upper extremities.  (Tr. 275).  Plaintiff was assessed as having left rotator cuff tendinitis and right ECRB tendinitis.  (Tr. 275).  Plaintiff received an injection of Kenalog[24] and Lidocaine[25] and was referred for structured therapy.  (Tr. 275).

Plaintiff had a radiograph on her left shoulder on the same day at the Duluth Clinic, which indicated modest osteoarthropathy[26] consisting of some narrowing and a small subchondral[27] cyst in the distal clavicle subchondral articular region.  (Tr. 284). Dr. Butcher noted that plaintiff had type 1 acromion,[28] minimal AC arthrosis.[29]  (Tr. 275).

---

[24]    Kenalog is a brand name for triamcinolone is used to treat the itching, redness, dryness, crusting, scaling, inflammation, and discomfort of various skin conditions. It is also used to relieve the discomfort of mouth sores.  See www.nlm.nih.gov/medlineplus/druginfo.

[25]    Lidocaine is in a class of medications called local anesthetics. It works by stopping nerves from sending pain signals.  See www.nlm.nih.gov/medlineplus/druginfo.

[26]    Osteoarthropathy: A disorder affecting bones and joints.  See www.stedmans.com.

[27]    Subchondral: Beneath or below the cartilages of the ribs.  See www.stedmans.com.

On January 12, 2004, plaintiff was re-evaluated by Dr. MacLean.   (Tr. 352). Dr. MacLean noted that plaintiff's functional capacity test recommended that she do light duty only work with maximum single hand carries of 40 pounds.   (Tr. 352).   Plaintiff had tenderness in her left shoulder, right elbow, and upper neck and back.   (Tr. 352). Dr. MacLean continued plaintiff's restrictions, lifting the weight restriction from 30 pounds to 40 pounds, and no over the shoulder lifting greater than 20 pounds. (Tr. 352).   Plaintiff began a trial of an anti-inflammatory drug, Voltaren,[30] as well as use of Tylenol.   (Tr. 352).   Plaintiff was searching for work activity that would remain within her work restrictions.   (Tr. 352).

On February 3, 2004, plaintiff again visited Dr. Butcher for a recheck of her left shoulder and right elbow.   (Tr. 274).   Plaintiff complained of recurrent pain in the left shoulder after some transient relief from the cortisone injections, and was having pain with reaching above her head and behind her back.   (Tr. 274).   Plaintiff felt that the last cortisone injection helped but her pain had been steadily worsening.   (Tr. 274). Plaintiff's examination showed tenderness to palpation about the lateral right

---

[28]   Acromion: The lateral end of the spine of the scapula which projects as a broad flattened process overhanging the glenoid fossa; it articulates with the clavicle and gives attachment to part of the deltoid and trapezius muscles.   See www.stedmans.com.

[29]   AC (acromioclavicular) Arthrosis: Acromioclavicular means relating to the acromion and the clavicle and denoting the articulation and ligaments between the clavicle and the acromion of the scapula.   Arthrosis is a synonym for osteoarthritis; pain and loss of function result; mainly affects weight-bearing joints, is more common in older persons.   See www.stedmans.com.

[30]   Voltaren is the brand name for diclofenac, which is in a class of medications called nonsteroidal anti-inflammatory medications. It works by stopping the production of certain natural substances that cause pain and swelling.   See www.nlm.nih.gov/medlineplus/druginfo.

trochanter,[31] pain with resisted extension of the wrist, full range of motion of the wrist, good grip strength and normal motor function.  (Tr. 274).   Her left shoulder showed marked tenderness in the anterior aspect.  (Tr. 274).  Plaintiff received a third cortisone injection of Kenalog and Lidocaine, and was referred for an MRI/arthrogram[32] of the left shoulder.  (Tr. 274).

Plaintiff saw Dr. Butcher on February 17, 2004 to review the MRI of her left shoulder.  (Tr. 271).  Plaintiff reported continued shoulder pain, which bothered her with overhead reaching and reaching behind her back; plaintiff felt that the last cortisone injection did help some, although not as well as they have in the past.  (Tr. 271). Examination showed tenderness to palpation about the anterolateral aspect of the shoulder with positive impingement signs; plaintiff had full passive range of motion but with pain beyond 90 degrees.  (Tr. 271).  Plaintiff also was tender over the right lateral elbow, and had a mildly positive ECRB challenge test.   (Tr. 271).   The MRI demonstrated subacromial bursitis[33] with undersurface degenerative disease of the rotator cuff, and Dr. Butcher assessed plaintiff with rotator cuff tendinitis with subacromial bursitis.  (Tr. 271).  Plaintiff received a cortisone injection of Kenalog and Lidocaine.

---

[31]     Trochanter: One of the bony prominences near the upper extremity of the femur. See www.stedmans.com.

[32]     Arthrogram: This test is an x-ray of a knee, shoulder, hip, wrist, ankle, or other joint.  See www.nlm.nih.gov/medlineplus/ency.

[33]     Bursitis: A bursa is a filmy-colored sac that protects and cushions your joints. Bursitis means inflammation of one of your bursa sacs. The inflammation may result from arthritis in the joint or injury or infection of a bursa. Bursitis produces pain and tenderness   and   may   limit   the   movement   of   nearby   joints.   See www.nlm.nih.gov/medlineplus.

Plaintiff was seen by Dr. Ann Sudoh in orthopedics at the Duluth Clinic on February 18, 2004 for left shoulder pain.  (Tr. 272).  Plaintiff stated that since she had been doing her physical therapy, she seemed to be having more pain.  (Tr. 272).  Plaintiff also started develop pain in her right shoulder.  (Tr. 272).  Examination showed that plaintiff's left shoulder showed decreased range of motion from 0 to 160 degrees of forward flexion; Dr. Sudoh could manipulate the shoulder to 180 degrees but this caused plaintiff pain.  (Tr. 272).  Abduction was also limited from 0 to 180 degrees, with full range of motion achieved but with pain.  (Tr. 272).  Because plaintiff's symptoms were getting worse with physical activity, Dr. Sudoh planned to obtain an MRI for further evaluation of plaintiff's rotator cuff and labrum.  (Tr. 272).

On March 10, 2004, Dr. Dayna Wolfe performed a functional capacity assessment at the request of the Social Security Administration.   (Tr. 413-420).  Dr. Wolfe determined that plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for a total of 6 hours in an 8 hour workday, sit for a total of 6 hours in an 8 hour workday, and that plaintiff was limited in her upper extremities for pushing and pulling.  (Tr. 414).  Dr. Wolfe found that plaintiff's postural limitations were limited to occasional climbing, balancing stooping, kneeling, crouching and crawling.  (Tr. 415).  Plaintiff's manipulative limitations were limited for reaching in all directions, handling, and fingering, and unlimited for feeling.  (Tr. 416).  Plaintiff had the ability for constant non-overhead reaching and feeling and fingering in her right hand, frequent handling and fingering in her left hand, and occasional overhead reaching.  (Tr. 416).  Plaintiff had no visual or communicative limitations.  (Tr. 416-417).  Plaintiff's environmental limitations were unlimited with the exception of hazards, from which she was to avoid concentrated exposure.  (Tr. 417).   Dr. Wolfe found that

plaintiff's symptoms were attributable to a medically determinable impairment, the severity or duration of the symptom was not disproportionate to the expected severity of duration, and that the severity of the symptom and its alleged effect on function was consistent with the total medical and nonmedical evidence.  (Tr. 418).

On March 30, 2004, plaintiff visited Dr. Butcher for a follow-up on her left shoulder with chronic should tendinitis related to rotator cuff instability.  (Tr. 270). Plaintiff reported she had recently had a duel injection series of Cortisone, but that the relief was short-lived.  (Tr. 270).  Plaintiff stated that she would like to proceed with a surgical intervention.  (Tr. 270).  Plaintiff's examination revealed exquisite tenderness to palpation about the anterolateral aspect of the shoulder.  (Tr. 270).  Plaintiff was going to contact an orthopedic office on her own and follow up with Dr. Butcher as needed. (Tr. 270).

On April 15, 2004, plaintiff was seen by Dr. Michael Momont at the Orthopaedic Associates of Duluth for complaints to her left shoulder.  (Tr. 379).  Dr. Momont noted that plaintiff's left AC joint was tender, and that impingement signs were positive on the left.  (Tr. 379).  He reviewed plaintiff's MRI and determined plaintiff had AC degenerative changes, with a partial thickness tear of the rotator cuff.  (Tr. 379).  He diagnosed plaintiff with impingement syndrome, left shoulder with partial thickness rotator cuff tear, and internal derangement left AC joint.  (Tr. 379).  Dr. Momont recommended proceeding with left shoulder arthroscopy decompression surgery. (Tr. 379).

On June 18, 2004, plaintiff had surgical arthroscopy of her left shoulder at the Lakewalk Surgery Center.  (Tr. 285-288).  Plaintiff presented for decompression surgery of impingement syndrome, left shoulder, with partial thickness rotator cuff tear and

internal derangement of left AC joint.   (Tr. 287).   Dr. Momont performed the surgery without complication.  (Tr. 286).

On June 28, 2004, plaintiff saw Dr. Momont, who noted that she was healing well, and that her motor and sensation were intact.  (Tr. 378).  Plaintiff followed up again with Dr. Momont on August 25, 2004, and he noted that she had a good result from the surgery and continued plaintiff's home exercise program.   (Tr. 378).

Plaintiff was treated at the Miller-Dwan Medical Center Pain Center from September of 2004 through December of 2004.  (Tr. 295-313).  On September 9, 2004, plaintiff was seen by Dr. David Nelson for persistent posterior shoulder and neck pain.  (Tr. 311).  Dr. Nelson noted that plaintiff's shoulder pain was improved with surgery, but her posterior thoracic and intrascapular pain remained.  (Tr. 311).  Plaintiff received a cervical medial branch block via injection.  (Tr. 311, 313).  At the time of discharge, plaintiff reported almost complete relief of her left interscapular and posterior shoulder pain.  (Tr. 311).

On October 14, 2004, plaintiff was again seen by Dr. Nelson, who noted that the diagnostic blocks of the left C5, C6 and C7 medial branch nerves given to plaintiff on September 9 gave plaintiff good relief for several days.  (Tr. 308).  The pain returned.  (Tr. 308).  At the time of the visit, plaintiff's pain was more intense on the right and Dr. Nelson gave plaintiff injections to block just that side.  (Tr. 308).  At the time of discharge, plaintiff reported a reduction in her right posterior neck and shoulder pain from a 4 out of 10 to a 1 out of 10.  (Tr. 308).

On October 21, 2004, plaintiff received confirmatory blocks of the right C5, C6 and C7 medial branch nerves from Dr. Nelson.  (Tr. 305).  Plaintiff reported that after the diagnostic blocks she received at her last visit, she had substantial relief of her neck

and shoulder pain for 18 – 24 hours. (Tr. 305). After the procedure, plaintiff reported a reduction in her neck and shoulder pain on the right from a 4 out of 10 to a 2 out of 10. (Tr. 305).

On October 18, 2004, state agency consultant, Dr. Gregory Salmi, reviewed plaintiff's medical records for a functional capacity assessment of plaintiff. (Tr. 333-340). Dr. Salmi determined that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand or walk with normal breaks for a total of 6 hours in an 8-hour workday, sit with normal breaks for a total of about 6 hours in an 8-hour workday and was limited in her upper extremities for pushing and pulling. (Tr. 334). Plaintiff could climb a ramp or stairs frequently, and balance, stoop, and kneel frequently. (Tr. 335). Plaintiff could crouch and crawl occasionally, and never climb a ladder, rope or scaffold. (Tr. 335). Plaintiff was limited to occasional overhead reaching, frequent non-overhead reaching, and constant handling, fingering and feeling. (Tr. 336). Plaintiff had no visual, communicative, or environmental limitations. (Tr. 336-337). Dr. Salmi determined that the symptoms were attributable to a medically determinable impairment, and that the severity of the symptoms and their effect on function were consistent with the medical evidence. (Tr. 338). This assessment was affirmed by Dr. Aaron Mark on April 14, 2005. (Tr. 340).

On October 28, 2004, plaintiff sent Dr. MacLean a letter enclosing an insurance form for Dr. MacLean to fill out. (Tr. 348). Plaintiff stated that her recovery from the left shoulder surgery was coming along well, that the medial branch blocks had given her about 50% relief of pain in her right side, and that she planned to try the same procedure for her left side. (Tr. 348).

Plaintiff visited Dr. Nelson again on November 5, 2004 for radiofrequency neuroablation[34] of the same medial branch nerves on the right. (Tr. 301). On December 10, 2004, Dr. Nelson noted that plaintiff was having a good response to the radiofrequency neurotomy procedure, but that she now had pain on her left. (Tr. 298). Given plaintiff's response to the radiofrequency neurotomy on her right, Dr. Nelson scheduled plaintiff for the same procedure on her left. (Tr. 298). The procedure was performed on December 17, 2004. (Tr. 295-297).

On December 16, 2004, plaintiff was seen by Dr. MacLean. (Tr. 346). Plaintiff noted approximately 50% pain improvement on her right side. (Tr. 346). Plaintiff was able to feed the animals and lift 20-25 pounds of feed at a time, but continued to feel weak with over the head work and believed it would be difficult to lift a 25 pound can above shoulder height. (Tr. 346). Plaintiff noted that when she was more active with gardening and around the house she seemed to suffer at night with increased pain. (Tr. 346). Plaintiff was noted to be sitting fairly comfortably but stiffly in the chair, and she had tenderness bilaterally to the face and neck. (Tr. 346). Plaintiff was assessed as having severe neck strain from motor vehicle accident, with gradual improvement, undergoing radio frequency ablation therapy; plaintiff hoped to return to her job in two to three months. (Tr. 346). Plaintiff's radio frequency ablation therapy was continued and her current work restrictions were also continued, with a follow-up regarding restrictions in two to three months anticipated. (Tr. 346).

Plaintiff was seen on June 7, 2005 by Dr. MacLean. (Tr. 344, 346). Plaintiff continued to have significant difficulty with many activities, and had severe stabbing

---

[34]     Neuroablation refers to surgical techniques in which pain-generating nerves and tissues are destroyed. See http://www.sjm.com/conditions/condition.aspx?name=Chronic+Pain&section=Therapy.

pain between her shoulder blades and then lower in her back. (Tr. 344). The pain was worse with deep breathing at night, and if she stayed with one activity for longer than 20 minutes. (Tr. 344). She was controlling her pain with ibuprofen and naproxen, and Lortab at bedtime. (Tr. 344). Dr. MacLean noted that on exam, plaintiff did not appear to be in acute distress but was sitting stiffly in her chair; there was point tenderness to the lower neck bilaterally and between the shoulder blades. (Tr. 344). Dr. MacLean assessed plaintiff as having severe neck strain from a motor vehicle accident, and failing ongoing improvement over the past six months. (Tr. 344). Dr. MacLean began plaintiff on a trial of MS Contin,[35] continuing Lortab, naproxen and ibuprofen as needed. (Tr. 344).

On June 8, 2005, Dr. MacLean wrote a letter to Mark Knutson in response to his question regarding whether Dr. MacLean believed plaintiff had reached maximum medical improvement. (Tr. 343). At that time, Dr. MacLean believed plaintiff had reached maximum medical improvement and that she had permanent impairment and recommended that she acquire the rating of permanent impairment. (Tr. 343).

On July 25, 2005, plaintiff saw Dr. MacLean for re-evaluation. (Tr. 344). Plaintiff was having difficulty with MS Contin, and she and Dr. MacLean discussed further medication possibilities. (Tr. 344). Plaintiff was to repeat a trial of long-acting narcotic pain medication with Duragesic,[36] as well as Lortab. (Tr. 345). Plaintiff and Dr. MacLean also discussed the possibility of spinal surgery. (Tr. 345).

---

[35]    MS Contin is a brand name for oral morphine, which is used to relieve moderate to severe pain. See www.nlm.nih.gov/medlineplus/druginfo.

[36]    Duragesic is a brand name for fentanyl skin patches, which are used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications. Fentanyl skin patches are only used to treat people who are tolerant (used to the effects of the medication) to narcotic

Dr. MacLean also completed a physical capacities evaluation of plaintiff on July 25, 2005.  (Tr. 373-375).  Dr. MacLean noted that plaintiff could sit, stand and walk for less than one hour total during an eight-hour day.  (Tr. 373).  She found that plaintiff could use her hands adequately for simple grasping and fine manipulation, but not for pushing and pulling, that she could use her hands for repetitive motion tasks, and that she could use her feet for repetitive movements.  (Tr. 373).  Dr. MacLean determined that plaintiff could occasionally lift and carry 11-20 pounds, and never carry 21-100 pounds, and that plaintiff was able to occasionally climb and kneel, but could never balance, stoop, crouch, crawl, or reach above shoulder level.  (Tr. 374).  Dr. MacLean found that plaintiff was totally restricted in activities involving unprotected heights, being around moving machinery, and driving automotive equipment, that she was moderately restricted in exposure to marked changes in temperature and humidity, and that she was not restricted in her exposure to dust, fumes, and gases.  (Tr. 374).  Dr. MacLean determined that plaintiff suffered from fatigue for which there was a reasonable medical basis, in that plaintiff suffered from chronic severe pain to the neck requiring frequent rests throughout the day and narcotic medications for pain control, and that the fatigue was disabling to the extent that it prevented plaintiff from working full time, even in a sedentary position.  (Tr. 374).  Further, Dr. MacLean opined that plaintiff's complaints of pain had a reasonable medical basis, that the pain was disabling to the extent that it would prevent plaintiff from working full time at even a sedentary position, and that plaintiff had deficiencies of attention and concentration due to the pain or side effects of medication that would result in a failure to complete tasks in a timely manner.  (Tr. 375).

_____

pain medications because they have taken this type of medication for at least 1 week. Fentanyl is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain.  <u>See</u> www.nlm.nih.gov/medlineplus/druginfo.

Dr. MacLean classified the pain as moderate, which constituted a significant handicap with sustained attention and concentration that would eliminate skilled work tasks. (Tr. 375).

On October 24, 2005, plaintiff visited Dr. MacLean for evaluation.  (Tr. 429). Plaintiff believed that her neck pain had actually worsened in the past month or two, and believed it was because the radial ablation treatment had started to wear off.  (Tr. 429). Plaintiff was interested in trying a chronic pain medication such as Duragesic.  (Tr. 429). Plaintiff was not interested in surgery, if she could avoid it.  (Tr. 429).  Dr. MacLean began a trial of the Duragesic patch.  (Tr. 429).

Plaintiff was seen at the Miller Dwan Pain Center on November 11, 2005 for radiofrequency neurolysis[37] of the C5, C6 and C7 medial branch nerves bilaterally. (Tr. 438-439).   Plaintiff tolerated the procedure well and there were no immediate complications.  (Tr. 438).

On December 8, 2005, Dr. William Fleeson, Occupational/Musculoskeletal Medicine, wrote a letter regarding his examination of plaintiff on July 19, 2005.[38] (Tr. 380-397).   As part of his examination, Dr. Fleeson obtained from plaintiff a description of her injury and history, conducted a physical examination of plaintiff, obtained current x-rays, examined and discussed approximately 200 pages of medical reports from the various providers discussed in this Report and Recommendation, and

---

[37]     Radiofrequency neurolysis is a procedure where neurolytic blocks are performed with radiofrequency ablation. A nerve is heated for a certain period of time until the pain pathway is blocked. See http://www.med.nyu.edu/painmanagement/patients/modalities.html.

[38]     It appears by the letter's structure and content that the examination was an independent medical examination or consultative examination conducted for the purpose of assessing plaintiff's condition as a result of the motor vehicle accident.

reviewed the traffic and police reports and photos associated with the accident. (Tr. 386-97).

Plaintiff described to Dr. Fleeson posterior headaches, occipital and cervical spine pain, muscle spasm with radiation into the trapezius and neck strap muscles, constant, and without radiation over her head.  (Tr. 388).  Plaintiff was unable to tip her neck to the side such as when using a phone, and she was unable to fold clothes for long or perform other minor activities of daily living without discomfort.   (Tr. 388). Plaintiff reported more or less constant spasms, pain, symptomatolgy in her peri-scapular musculature and mid-to-low spine.  (Tr. 388).  She also indicated that she was unable to get comfortable during the night, and there were a large number of tasks and previously enjoyed activities in which she could no longer participate, including ironing, baking, anything around the farm such as carrying feed, sewing, driving, fishing, and riding horses.  (Tr. 388-389).  Plaintiff acknowledged being frustrated, disgusted, and overwhelmed because she was unable to do much around the home or farm.  (Tr. 389). She stated that she identified with being a registered nurse and liked to work, and was quite distressed that she had been unable to get back to any work.  (Tr. 389).  Plaintiff described adverse mood effects from lack of sleep, and being crabby from strain due to her limitations and chronic pain problems.  (Tr. 389).

Dr. Fleeson's physical examination of plaintiff revealed no tenderness over the lumbar spine; the thoracic spine was tender to palpation and the entire cervical spine was tender as was the suboccipital region of the head and the bilateral posterior neck areas.  (Tr. 395).  There was diffuse and quite dramatic muscle spasm over the right and left shoulder girdle and trapezius areas; all these areas were quite tender, consistent with trigger points.  (Tr. 395).  Range of motion in the neck showed very

decreased neck motion in flexion.  (Tr. 395).  Lateral bend and rotation were one-third to one-half of normal, and all produced pain in the neck and trapezius; cervical spine motion against resistance produced posterior neck pain and pain in the left upper lateral chest region near the clavicle.  (Tr. 395).  Shoulder examination showed stiffness but more or less full range of motion and no specific significant point of tenderness; elbows were within normal limits.  (Tr. 395).  Plaintiff complained of mild discomfort when holding a five-pound weight in her hands; with a ten-pound weight this dramatically increased.  (Tr. 396).  Dr. Fleeson obtained three views of the cervical spine; the lateral view showed slight narrowing at C3-4, C4-5 was within normal limits, and at C5-6 there was significant narrowing with near-loss of disc space.  (Tr. 396).  At C6-7 there was narrowing which was also moderate to severe.  (Tr. 396).

Based on all of this information, Dr. Fleeson offered the following opinions:

- Plaintiff's treatment over the previous 3 ½ years had not been very helpful, and it would be reasonable for her to have further workup with a new MRI and some further or repeated attempts at therapeutic intervention. (Tr. 381).

- A coordinated effort was required to reduce her problems with a burst dose of decreasing corticosteroid, trigger point injections and muscle relaxants simultaneously, perhaps a repeat of the medial branch blocks, and then an evaluation by a tertiary center spine surgeon.  (Tr. 381).

- Plaintiff had neck, occipital and shoulder girdle pain as a result of cervical spine disc herniations and associated soft tissue injuries from the motor vehicle accident, and that she had a chronic pain syndrome with associated depression.  (Tr. 382).

- The collision was the direct and proximate cause of this diagnosis, excepting that there was pre-existing degenerative disc disease in the cervical spine.  (Tr. 382).

- The prognosis for plaintiff's condition was that substantial improvement was very guarded to poor.  (Tr. 382).

- The combination of plaintiff's severe pain with no cervical radiculopathy[39] suggested that plaintiff was probably not going to be operated on and that her symptomatology would remain as it was.  (Tr. 382).

- Treatment of plaintiff was difficult given that the chronic pain syndrome usually accentuates a person's symptomatology, and that the problem in the cervical spine was a multiple levels.  (Tr. 382).  The prognosis was for plaintiff to continue to have essentially the symptomatology that she had, or worse, with the same or worsening limitations on her ability to perform activities.  (Tr. 383).  He expected plaintiff to continue to experience neck, occipital, and shoulder girdle pain and experience limitations in her ability to tolerate or participate in physical activities, and expected the degenerative disc disease in the cervical spine to further deteriorate, with more narrowing and more stenosis.  (Tr. 383).

- Regarding employment and other activities, plaintiff should not be required to flex, extend or rotate the head or neck; that she not be required to lift or reach above shoulder level; to lift greater than 5-10 pounds and that should be from no lower than the waist and to no higher than mid-chest level.  (Tr. 384).  Dr. Fleeson also indicated that plaintiff should not be required to bounce along the road in a vehicle, or to push or pull greater than 50 pounds, which should be on good wheels on hard level surfaces.  (Tr. 384).  Plaintiff should be able to change positions frequently and maintain no posture for more than 10-15 minutes.  (Tr. 384).  Dr. Fleeson further opined that plaintiff was not suitable for working more than approximately two hours per day.  (Tr. 384).

- Regarding a permanent impairment or disability rating, plaintiff was reasonably rated at 15-20% for the cervical spine conditions, 5% for the shoulder girdle symptomatology, 5% for the left shoulder condition including the surgical intervention, and 10% for the chronic pain syndrome/depression that was the result of the injuries.  (Tr. 384).  Plaintiff met the criteria for a permanent impairment rating under the AMA Guides to the Evaluation of Permanent Impairment.  (Tr. 384-385).  Dr. Fleeson suspected the ratings would be higher in a few years due to progression of the conditions and decreased functional abilities.  (Tr. 385).

On January 25, 2006, plaintiff visited Dr. MacLean for further evaluation. (Tr. 428).  Plaintiff reported that her pain was more manageable with the Duragesic. (Tr. 428).  In November, plaintiff had undergone three levels of radiofrequency ablation

---

[39]    Radiculopathy: Disorder of the spinal nerve roots.  See www.stedmans.com.

or rhizotomy,[40] and had noticed improvement in her shoulder pain; her pain was now focused in her neck again.  (Tr. 428).  Plaintiff was having difficulty with routine activities of daily living, and was only able to wrap one Christmas present at a time.  (Tr. 428).  Plaintiff was able to read for five minutes at a time and had difficulty with sewing and folding clothes.   (Tr. 428).   Plaintiff was searching for a job, and had been recommended a possible referral to a spine specialist, which she was considering.  (Tr. 28).  During the exam, plaintiff sat quite stiffly, and had ongoing tenderness in her neck.  (Tr. 428).  She was careful with any movements of her neck or head.  (Tr. 428).  Plaintiff was continued on Lortab and Duragesic.  (Tr. 428).  Dr. MacLean restarted plaintiff on Effexor, and anticipated that she would remain on it through the winter and perhaps stop it in May or June and restart it again the following winter, as there was a seasonal component to her depression.  (Tr. 428).

On April 20, 2006, Dr. MacLean saw plaintiff.  (Tr. 424).  Plaintiff had started methadone and decreased her Lortab use.  (Tr. 424).  Plaintiff continued to have significant disability regarding the use of her neck and arms, and continued to have episodic weakness in her left arm.  (Tr. 424).  Plaintiff had experienced relief with using Lortab.  (Tr. 424).  Plaintiff expressed fear regarding spinal surgery, and Dr. MacLean encouraged her to have at least an evaluation with one of the spine center surgeons.  (Tr. 424).  Plaintiff felt more calm on the methadone than on the Lortab.  (Tr. 424).  Plaintiff continued to sit protectively of her neck, appeared to have good strength in her left arm currently and good grip strength, and she reported that her weakness

---

[40]     Rhizotomy: Section of the spinal nerve roots for the relief of pain or spastic paralysis.   See www.stedmans.com.   Radiofrequency rhizotomy, also called radiofrequency neurotomy, is the surgical "de-nerving" of the facet joint.  See http://my.clevelandclinic.org/.

symptoms had disappeared this week compared to last week.  (Tr. 424).  Dr. MacLean noted plaintiff showed improvement on methadone versus Lortab.  (Tr. 424).

Plaintiff's methadone use was reevaluated by Dr. MacLean on May 10, 2006.  (Tr. 423).  Plaintiff felt the methadone was improving her pain control, but she had also been taking Lortab.  (Tr. 423).  Plaintiff and Dr. MacLean discussed problems with being on dual narcotics, and Dr. MacLean increased plaintiff's methadone and decreased her Lortab.  (Tr. 423).

On June 14, 2006, plaintiff reported to Dr. MacLean that she felt she had become addicted to Lortab and tapered herself off and stopped it.  (Tr. 422).  Plaintiff had also stopped taking methadone.  (Tr. 422).  Plaintiff felt that her pain was worse off the medication, and she had restarted her naproxen.  (Tr. 422).  Plaintiff sat stiffly as usual; Dr. MacLean noted a possible addiction to Lortab and that plaintiff was currently off all narcotic medications and tolerating it well.  (Tr. 422).  Dr. MacLean continued plaintiff on Naprosyn, and discussed the possibility of Celebrex if stomach pain recurred on the Naprosyn.  (Tr. 422).  Dr. MacLean anticipated a follow-up if neck pain worsened or if there was desire for further medication management.   (Tr. 422).   Plaintiff was considering a repeat rhizotomy in the fall.  (Tr. 422).

On July 20, 2006, plaintiff visited with Dr. MacLean for evaluation of her neck pain and desire to try another pain medication.  (Tr. 422).  Plaintiff noticed worsening of spasms in her neck, especially in the past week, poor sleep, shoulder pain and burning pains; plaintiff had been taking naproxen with minimal relief.  (Tr. 422).  Plaintiff was not interested in trying Lortab again; Dr. MacLean prescribed Tylenol #3 and tramadol.[41]

---

[41]     Tramadol is used to relieve moderate to moderately severe pain.  <u>See</u> www.nlm.nih.gov/medlineplus/druginfo.

(Tr. 422).   Plaintiff also complained of right-sided mid-back pain that improved with a bowel movement and Dr. MacLean recommended further evaluation.   (Tr. 422).

Plaintiff saw Dr. MacLean on August 30, 2006.   (Tr. 493).   Plaintiff reported that her pain had caused so much difficulty for her this summer that she did not travel to horse shows as she normally does and that she had not been feeling well with the pain. (Tr. 493).   Plaintiff was getting only 3 hours of sleep most nights.   (Tr. 493).   Plaintiff had been taking Tylenol with codeine and tramadol and had tried Celebrex in the past with no relief.   (Tr. 493).   Plaintiff had scheduled herself for another rhizotomy at the end of September, and was reluctant to pursue surgery.   (Tr. 493).   Upon examination, plaintiff did not appear to be in any acute distress but was tender, holding her neck stiffly and resting it on the wall.   (Tr. 493).   Plaintiff was continued with the tramadol, stopped on the Tylenol with codeine, and was started on trials of Arthrotec[42] and Percocet.[43] (Tr. 93).   On August 30, 2006, Dr. MacLean wrote a prescriptive note for plaintiff which stated that plaintiff continued to be unable to work any type of work, and that plaintiff remained totally and permanently disabled due to her neck injury.   (Tr. 440).

On October 4, 2006, Dr. MacLean noted that plaintiff had been using primarily Percocet.   (Tr. 492).   Dr. MacLean ordered a repeat MRI of the cervical and thoracic spines.   (Tr. 492).

---

[42]   Arthrotec is a brand name drug used to relieve the pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints) in patients who have a high risk of developing stomach ulcers.   See www.nlm.nih.gov/medlineplus/druginfo.

[43]   Percocet is a combination of oxycodone with acetaminophen.   Oxycodone is used to relieve moderate to severe pain. Oxycodone is in a class of medications called opiate (narcotic) analgesics. It works by changing the way the brain and nervous system respond to pain.   See www.nlm.nih.gov/medlineplus/druginfo.

On October 7, 2006, plaintiff had a cervical MRI, which revealed moderately advanced degenerative changes at C6-7, C5-6 and C3-4.  (Tr. 471).  The MRI indicated that plaintiff had degenerative disease in the cervical spine, with moderate central stenosis at C6-7 with moderate to moderately-severe right C6-7 lateral recess and medial foraminal stenosis; moderate central stenosis at C5-6 with mild to moderate bilateral medial foraminal narrowing secondary to uncinate[44] spurring; mild central stenosis at C3-4 with moderate lateral recess narrowing on the right secondary to uncinate ridging.  (Tr. 471).

Plaintiff underwent a thoracic MRI on the same day, which revealed mild degenerative changes in the mid thoracic spine, with mild ventral annular thickening on the left at T7-8 and moderate degenerative change involving the right T9-10 facet.  (Tr. 473).

On October 26, 2006, plaintiff visited Dr. MacLean regarding her Percocet use.  (Tr. 491).  Plaintiff had received another rhizotomy which caused increased pain for her over three to four weeks.  (Tr. 491).  Plaintiff reported continued severe neck pain and driving short distances wiped her out.  (Tr. 491).

Plaintiff saw Dr. MacLean on December 21, 2006, and was meeting pain control with Percocet.  (Tr. 490).  Plaintiff did not appear to be in any acute distress, and sat stiffly, though she moved her neck a little more loosely than usual.  (Tr. 490).  Plaintiff had ongoing point tenderness throughout the peri-cervical spine area bilaterally.  (Tr. 490).  Plaintiff was continued on Percocet.  (Tr. 490).

On February 22, 2007, plaintiff reported to Dr. MacLean that she had noticed no significant improvement in her neck pain following her rhizotomy, and had noticed a

---

[44]     Uncinate: Hooklike or hook-shaped.  See www.stedmans.com.

hypersensitivity to touch over her C7, which was new.  (Tr. 488).  Plaintiff did not appear to be in any acute distress upon examination, and continued to sit stiffly.  (Tr. 488).  She had tenderness and some slight swelling over C7.  (Tr. 488).  The Percocet was stopped, plaintiff was begun on Roxicodone[45] and continued with Ultram.[46]  (Tr. 488).

On March 15, 2007, plaintiff was seen by Dr. Robert Donley, a neurosurgeon, on referral by Dr. MacLean and Dr. David Nelson.  (Tr. 480-481).  Upon exam, Dr. Donley noted that plaintiff had no objective motor sensory deficit, no objective weakness upper or lower extremities, no atrophy on supination, and her posterior column and anterolateral system were normal in all four extremities.  (Tr. 480).  Dr. Donley's review of the MRIs showed that plaintiff had no spinal cord abnormalities and that the remainder of the spinal room available was fairly good.  (Tr. 481).  Dr. Donley noted that plaintiff's neck views were satisfactory, and there was no major pain that he could detect.  (Tr. 481).  Dr. Donley informed plaintiff that she has failed all percutaneous[47] approaches, and that he would not recommend any further neck cervical spine blocks.  (Tr. 481).  Dr. Donley told plaintiff to find a good massage therapist or chiropractor and to stay as active as possible.  (Tr. 481).  As things failed, Dr. Donley indicated he would consider doing a fusion of the C3 and C4 level and decompressing the anterior cord.  (Tr. 481).  Dr. Donley's diagnosis was cervical spondylosis[48] on multiple levels with chronic neck pain and headaches.  (Tr. 481).  Following the examination, Dr. Donley

---

[45]  Roxicodone is a brand name for oxycodone, which is used to relieve moderate to severe pain. See www.nlm.nih.gov/medlineplus/druginfo.

[46]  Ultram is a brand name for tramadol, which is used to relieve moderate to moderately severe pain. See www.nlm.nih.gov/medlineplus/druginfo.

[47]  Percutaneous: Made, done, or effected through the skin.  See www.oed.com.

[48]  Spondylosis: Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.  See www.stedmans.com.

sent Dr. MacLean a note on March 15, 2007 saying that he would "sit tight and go conservative." (Tr. 482).

On April 2, 2007, plaintiff reported to Dr. MacLean that in light of Dr. Donley's recommendation of massage or pool therapy that she was considering a hot tub for moist heat and jet type therapy. (Tr. 487). Plaintiff stated that she was only able to sit for about five minutes prior to the need to move, stand for about five minutes, and walk for a maximum of thirty minutes before increased severe pain. (Tr. 487). She was unable to lift anything above waist height and was unable to lift anything above ten pounds, managed to brush her own hair but tended to lose her grasp when holding things; plaintiff had noticed ongoing right hand and arm weakness at times, and was unable to perform desk-type activities as she was unable to have her head looking down for more than five minutes at a time. (Tr. 487). Plaintiff did not perform any computer work at home, and had difficulties folding clothes and performing paperwork. (Tr. 487). Plaintiff and her husband had downsized their elk ranch from 35 elk to 12 elk and her husband performed essentially all of the activities. (Tr. 487). Plaintiff did not appear to be in any acute distress, continued with tenderness down the cervical spine, and her grip strength appeared weaker bilaterally. (Tr. 487).

On April 3, 2007, Dr. MacLean wrote a letter on behalf of plaintiff, stating that plaintiff was unable to work a livable wage due to severe chronic pain issues. (Tr. 479). Dr. MacLean also indicated that plaintiff was unable to sit for more than 5 minutes, stand for more than five minutes or walk for more than thirty minutes without severe pain. (Tr. 479). Plaintiff was unable to lift anything greater than 10 pounds and unable to lift anything above waist height; plaintiff required assistance with washing her hair and bathing at home, tended to lose a grasp when washing dishes, and was unable to

44

look down at a table or up at a computer for more than five minutes at a time and thus was unable to perform sedentary tasks such as paperwork or computer work for folding clothes.  (Tr. 479).   Dr. MacLean also stated that plaintiff had failed trials of physical therapy, multiple rhizotomy procedures and medication management in regard to her ability to return to any type of employment, and that surgical treatment was not recommended at this time.   (Tr. 479).   Plaintiff had continued with home physical therapy on a regular basis and was currently undergoing counseling regarding severe grief reaction due to loss of ability to perform routine tasks and due to chronic pain syndrome.  (Tr. 479).

### 2.    Mental Health Medical Records

At the request of the Social Security Administration, Dr. Lyle Wagner performed a mental status examination and description of daily functioning for plaintiff on November 4, 2004.  (Tr. 289-293).  Plaintiff reported that she was treated for alcoholism in 1999 and that she had been sober since May of 2000.  (Tr. 290).   Plaintiff also reported that in the late 1980s, she was hospitalized at St. Luke's for suicidal thoughts and attempted suicide when she cut her left wrist with a razor.  (Tr. 290).   She was also treated as an outpatient at the Human Development Center in Duluth, seeing a therapist and a psychiatrist in the late 1980s and early 1990s.  (Tr. 290).   At the time of the evaluation, plaintiff was taking Effexor,[49] which she received from her family physician, and did not have a therapist.  (Tr. 290).   Dr. Wagner noted that plaintiff's thought process was logical and organized, that her speech was of normal rate and rhythm, and did not observe delusional thought process or paranoia; plaintiff denied hallucinations.

---

[49]     Effexor is a brand name for venlafaxine, which is used to treat depression.  See www.nlm.nih.gov/medlineplus/druginfo.

(Tr. 291).  Plaintiff stated that she experienced depression three or four days per week, fluctuating between a 1 and a 4 on a 0-10 scale (with 10 being the highest).  (Tr. 291).  She stated that she experienced insomnia, mostly related to pain, but possibly related to depression also.  (Tr. 291).  Plaintiff denied suicidal thoughts and feeling hopeless or helpless, and described her energy level as being low; plaintiff's reality contact was adequate.  (Tr. 291).  Plaintiff's general fund of knowledge was average.  (Tr. 292).

Dr. Wagner determined that plaintiff would have the capability of understanding and retaining complex instructions, that she should have little difficulty persisting at a reasonable pace, that she would have little to no difficulty getting along with co-workers and supervisors, and that she would not have any difficulty managing stress and pressure in a work setting.  (Tr. 292).  Dr. Wagner opined that plaintiff's inability to work rested almost exclusively with her physical problems, not her psychiatric state.  (Tr. 292).  Dr. Wagner further noted that plaintiff's depression appeared to be rather well-controlled with the Effexor, and that she seemed to function within the average range cognitively.  (Tr. 293).

Dr. Wagner made the following diagnostic impressions:

Axis I:      311    Depressive Disorder Not Otherwise Specified

Axis II:     799.9  Diagnosis Deferred

Axis III:           Deferred to Medical Doctors

Axis IV:            Coping with her physical/medical problems, and how this currently negatively impacts upon her level of adaptive functioning

Axis V:      GAF= 68 [current][50]

---

[50]    The GAF scale is used to assess an individual's overall level of functioning.  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000 Revision)).  The lower the score, the more serious the individual's symptoms.  See id.  A GAF score of

On November 15, 2004, a state agency physician, Dr. Dan Larson, performed a functional capacity assessment of plaintiff.  (Tr. 314-332).  Dr. Larson determined that plaintiff had depression.  (Tr. 317).  Dr. Larson determined that plaintiff's restriction of activities of daily living were mild, that her difficulties in maintaining social functioning were mild, that her difficulties in maintaining concentration, persistence or pace were moderate, and that she had no episodes of decompensation.  (Tr. 324).  Plaintiff's ability to remember locations and work-like procedures and her ability to understand and remember short and simple instructions were not significantly limited, and that her ability to understand and remember detailed instructions was moderately limited.  (Tr. 328).  Plaintiff was not significantly limited in her ability to carry out short and simple instructions, or in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.  (Tr. 328).  Plaintiff was also not significantly limited in her ability to sustain an ordinary routine without special supervision, in her ability to make simple work-related decision, or in her ability to complete a normal workday and workweek.  (Tr. 328-329).  Plaintiff was moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and in her ability to work in coordination with or proximity to others without being distracted by them.  (Tr. 328).  Plaintiff was not significantly limited in social interaction and adaptation, and was moderately limited in her ability to interact appropriately with the general public.  (Tr. 329).  Dr. Larson determined that plaintiff was able to drive and handle money, could socialize but could

61 – 70 indicates an individual has some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functions pretty well, and has some meaningful interpersonal relationships.  Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).

be irritable, was able to get along well with coworkers and supervisors, her concentration was sufficient for basic chores, that plaintiff's persistence, pace and stress tolerances were sufficient, and that plaintiff had not deteriorated in a work or work-like setting.  (Tr. 332).

According to Dr. Larson, plaintiff retained the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.  (Tr. 332).  Her ability to carry out tasks with adequate persistence and pace would be mildly impaired but adequate for routine, repetitive or detailed tasks but not for complex tasks.  (Tr. 332).  Her ability to interact and get along with co-workers would be mildly impaired but adequate for most social contact.  (Tr. 332).  Her ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.  (Tr. 332).  Plaintiff's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.  (Tr. 332).  Her ability to accept supervision would be moderately impaired, but adequate to cope with ordinary levels of supervision found in a customary work setting, and her ability to handle stress would be mildly impaired but adequate.  (Tr. 332).  Dr. Owen Nelson, affirmed Dr. Larson's report on April 11, 2005.  (Tr. 314).

On March 5, 2004, plaintiff described to Dr. MacLean a long history of depression being treated with Wellbutrin,[51] trazodone, and Serzone.  (Tr. 350).  Plaintiff stated that she remained depressed, denied suicidal ideation and complained that she had difficulty

---

[51]    Bupropion (Wellbutrin, Wellbutrin SR, Wellbutrin XL) is used to treat depression. See www.nlm.nih.gov/medlineplus/druginfo.

engaging in her normal daily activities due to decreased interest.   (Tr. 350).
Dr. MacLean started the plaintiff on Effexor.  (Tr. 351).

On June 7, 2005, plaintiff felt that her depression was under control and had
discontinued the Effexor because it made her nauseated.  (Tr. 344).  She was not
having suicidal thoughts but had little energy.  (Tr. 344).

On July 19, 2005, Dr. Fleeson noted that plaintiff had become depressed due to
her long standing limitations, chronic pain, and failure of treatment to reduce her
symptomatology.  (Tr. 381).  Plaintiff also informed Dr. Fleeson that she was distressed
that she could not return to work, described adverse mood effects from lack of sleep,
acknowledged considerable marital stress due to her 'crabby' mood and chronic pain
problems.  (Tr. 389).

During a visit with Dr. MacLean on January 5, 2006, plaintiff expressed interest in
restarting a trial of antidepressants.  (Tr. 428).  Plaintiff had restarted Effexor but found
she was unable to sleep and stopped it soon after.  (Tr. 428).  Plaintiff reported
increased crying episodes, increased fatigue, lack of sleep, decreased appetite, feeling
useless, increased frustration in her inability to perform routine activities and increased
hopelessness.  (Tr. 428).  Plaintiff had no suicidal thoughts and was continuing AA.
(Tr. 428).  Dr. MacLean restarted plaintiff on Effexor.  (Tr. 428).

On April 20, 2006, Dr. MacLean noted that plaintiff's chronic severe depression
was improved with Effexor.  (Tr. 423).

On July 20, 2006, Dr. McLean noted that plaintiff had chronic severe depression
with acute exacerbation, which was improved with Effexor.  (Tr. 423).

On November 21, 2006, plaintiff underwent an initial assessment with Carina
Barker, LICSW, following intake at St. Luke's Mental Health Services after being

referred by Dr. MacLean. (Tr. 474). Plaintiff was feeling useless and had been feeling discouraged and having mood changes for the past 2 years. (Tr. 474). Plaintiff indicated concerns and feelings related to problems with changes in hygiene, loss of energy, social withdrawal and financial problems, irritability, poor impulse control and sexual behavior changes. (Tr. 474). Plaintiff was also indicating concerns with difficulties with sleeping. (Tr. 474). Plaintiff was also having obsessive thoughts, anxiety, social fears and excessive worrying, and she indicated feelings of sadness, hopelessness, guilt and shame, racing thoughts and concentration problems. (Tr. 474). Three weeks prior, plaintiff had started Cymbalta.[52] (Tr. 475). Plaintiff had been exposed to trauma through the car accident, and indicated that she was sexually abused by one of her brothers from ages 3 to7, which she worked through in therapy. (Tr. 475). Plaintiff's speech and tone were within normal limits, and she was tearful. (Tr. 475). She was not endorsing thoughts of self-harm.

At the time, plaintiff's DSM IV Diagnosis was established as:

| | |
|---|---|
| Axis I | 296.32 Major Depressive Disorder, Recurrent, Moderate<br>History of 303.90 Alcohol Dependence, in full remission<br>R/O Post Traumatic Stress Disorder |
| Axis II | Deferred |
| Axis III | Severe chronic, pain, neck and back injuries |

---

[52]  Cymbalta is the brand name for duloxetine, which is used to treat depression and generalized anxiety disorder (GAD; excessive worry and tension that disrupts daily life and lasts for 6 months or longer). Duloxetine is also used to treat pain and tingling caused by diabetic neuropathy (damage to nerves that can develop in people who have diabetes). See www.nlm.nih.gov/medlineplus/druginfo.

Axis IV       Depression related to accident, anger related to accident, feeling "useless," self identity

Axis V        GAF: 53[53]

(Tr. 476).   Plaintiff was to begin weekly individual therapy to begin the process of healing from the anger and depression related to the automobile accident.  (Tr. 476).

On December 8, 2006, plaintiff presented for therapy with Barker.  (Tr. 477). Plaintiff noted that she was stressed about financial concerns, and that she weaned herself off Cymbalta.  (Tr. 477).  Plaintiff was not endorsing thoughts of self-harm. (Tr. 477).

On December 21, 2006, Dr. MacLean noted that plaintiff stopped taking Cymbalta when she developed insomnia and mind racing episodes that lasted for four days.  (Tr. 490).  Dr. MacLean began plaintiff on a trial of Seroquel.[54]  (Tr. 490).

Plaintiff saw Barker again on February 1, 2007.  (Tr. 478).  Plaintiff discussed symptoms of depression, and stated that she was struggling with insomnia at times. (Tr. 478).  Plaintiff also stated that she was currently going through the process of disability and expressed her concerns regarding this process.  (Tr. 478).

On February 22, 2007, plaintiff saw Dr. MacLean and reported that she had starting taking the Seroquel nightly; she felt that it may have been helping her anxiety

---

[53]     GAF scores of 51 to 60 reflect "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).

[54]     Seroquel is the brand name for quetiapine, which is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). It is also used to treat episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). See www.nlm.nih.gov/medlineplus/druginfo.

but was not helping her sleep.  (Tr. 488).  Dr. MacLean encouraged her to increase the Seroquel at bedtime.  (Tr. 488).

On April 2, 2007, Dr. MacLean noted that plaintiff had been started on Seroquel since her last evaluation, and plaintiff noticed it was helping her sleep better.  (Tr. 488). Dr. MacLean noted that plaintiff was coping fairly well with her pain overall, was not having suicidal thoughts; she increased plaintiff's Seroquel dosage.  (Tr. 487).

### 3.    Plaintiff's Hearing Testimony

On August 31, 2006, plaintiff appeared and testified at the hearing held before the ALJ.  (Tr. 443).  Plaintiff testified as follows: she received her secretarial certificate and worked as a secretary for almost two years.  (Tr. 447-448).  The last job she had was as a registered nurse at Miller Dwan Hospital in Duluth.  (Tr. 448).  She had not gone back to work since the accident.  (Tr. 448).  She testified that she was unable to function on a daily basis; she was fatigued because she could not sleep and was in constant chronic pain.  (Tr. 448).  She had hoped to get back to work after the accident but it never happened.  (Tr. 448-449).  Plaintiff went through a lot of therapies and nothing resolved anything for her.  (Tr. 449).

During a typical day, plaintiff got up as early as 4:00 or 5:00 a.m., made something to eat and took her pain medications, and then got dressed and would try to walk for a little bit.  (Tr. 449).  She took one to two naps per day but had trouble finding comfortable positions.   (Tr. 449).   Her husband had taken over most of the duties around the house – for example, folding laundry, doing paperwork or anything where her head was down.   (Tr. 450).  She could not do repetitive things and had numbness tingling in her right hand.  (Tr. 450).  Her husband helped with dishes, laundry, and

vacuuming; plaintiff has tried to vacuum with a light vacuum but she has to watch her reaching. (Tr. 450).

Plaintiff has pain in her neck, and spasms, which are a shooting pain; she has a fatigue, weakness, a tightening feeling at times, and headaches above her neck where her skull and head meet; she also has problems above her shoulder blades. (Tr. 451). Plaintiff has trouble turning her neck for more than a few minutes, and cannot read books unless she holds them up because after five minutes her neck tightens up and she starts getting spasms. (Tr. 451). She also has some lower back right pain on the right side. (Tr. 451).

Plaintiff and her husband have a small farm and her husband deals with it; she used to be involved and had tried to feed the animals, but ended up having spasms because of the repetitiveness of the activity. (Tr. 452). Plaintiff used to have a very big garden, and tried to do gardening the first year after the accident, but it did not work out. (Tr. 452). Sometimes she is able to water, but she cannot do any of the gardening. (Tr. 452). Plaintiff still has horses, but does not ride them. (Tr. 452-453). Prior to the accident, she used to be able to help hitch them. (Tr. 453). Since the accident, plaintiff and her husband have had dogs, chickens, a pheasant, and elk, but they are downsizing. (Tr. 454).

Plaintiff usually will get a spasm if she tries to lift anything that weighs 20 pounds and is then laid up for a few hours. (Tr. 455). Plaintiff can spend one hour on her feet if she is moving and able to adjust herself, and can walk for 15 or 20 minutes and rest and needs to be able to have access to sit down. (Tr. 455). Sitting bothers her and she has to be able to reposition herself a lot. (Tr. 455). Plaintiff tried not to drive much because her neck and shoulder bother her and sometimes in her lower right side after she sits.

(Tr. 455-456).  She drove to the doctor, to the grocery store, to her mother's and her daughter's, but usually she went with her husband because he did most of the driving. (Tr. 457).

Plaintiff and her husband have traveled to horse shows in St. Paul and Iowa since June of 2002, but she has not traveled out of the country or taken any other vacations.  (Tr. 459).  Plaintiff is no longer able to use a computer because she cannot sit in front of it comfortably.  (Tr. 460).

Plaintiff takes medication for depression.  (Tr. 453).  Plaintiff's medications give her side effects; she gets tired from them and confused, but if she uses lighter medicine she cannot get any sleep.  (Tr. 454).  In addition to medication and exercises, plaintiff uses a TENS unit and a muscle stimulator.  (Tr. 460).  She has difficulty putting the patches on and so waits until her husband is home.  (Tr. 460).  She also uses a Thera Cane.[55]  (Tr. 460).  Plaintiff had scheduled another rhizotomy, which are painful but which help with her shoulder blade pain.  (Tr. 461).  Eventually the rhizotomies may not help because of scar tissue buildup.  (Tr. 461).

Dr. MacLean has told plaintiff that she was totally disabled and she is unable to hold a job.  (Tr. 461).  Plaintiff feels that she can safely lift 5 to 10 pounds repetitively, and maybe only 5 pounds, depending on where she was lifting from because she has to be careful with her reaching.  (Tr. 462).  Overhead reaching is a problem; she can reach down and up but repetitive motion is a problem.  (Tr. 463).  Plaintiff is lucky if she sleeps more than two hours every night; she tries to take naps for an hour but sometimes just rests.  (Tr. 464).  Plaintiff is a very motivated person and wants to work; she loved her

---

[55]     Thera Cane is a self massager used to apply pressure to sore muscles.  <u>See</u> www.theracane.com.

job and now that she is unable to do things for people she has been very depressed about it.  (Tr. 464).

### 4.  Statements Regarding Activities of Daily Living

On March 5, 2004, plaintiff completed an Activities of Daily Living Questionnaire. (Tr. 222-227).  Plaintiff indicated that she had neck, back and muscle spasms after her impairment began, and a left shoulder tendon tear and inflamed tendon in her right lower arm.  (Tr. 222).  Prior to her impairment, plaintiff was very active and did a lot of physical work, including fencing, farming chores and heavy lifting at work.  (Tr. 222). After the impairment, plaintiff's sleep was inconsistent and she did not wash her hair as often because it was hard on her arms, although she generally maintained average appearance and grooming; prior to the impairment she was always well groomed. (Tr. 222).

On a typical day after her impairment, plaintiff indicated that she checked on the animals and fed the small horse grain; did arm and neck and back exercises most mornings; did household chores, such as the dishes, vacuuming, and making the bed; watched television and occasionally read; dished up some animal feed on some days; went for a walk and to the store some days; went to doctor visits, and made meals. (Tr. 222).  Prior to the impairment, plaintiff did most of the farm chores on all weekdays, worked part-time, and did all of the household chores.  (Tr. 223).  Plaintiff stated that she only did light work around the house since the impairment.  (Tr. 223).  Plaintiff's hobbies and interests included draft horses, which she helps with feeding and grooming, but not as much as she used to because it is hard on her neck and arms; plaintiff also reads.  (Tr. 223).  Plaintiff was more socially active before her impairment;

she has close friends but only keeps in contact by phone.  (Tr. 223-224).  She stops to see her mother and sister about once a month when she is in town.  (Tr. 224).

Plaintiff indicated that she drove two to three times a week to the doctor or store, prepared meals for herself and her husband, picked up the yard occasionally, read the newspaper every day, watched television for 3-5 hours per day, could fix small items, bathed three times per week, spoke with people in the horse club, might visit her friends one to two times every three months, did some of the feeding of the horses, tried to plant flowers although it was difficult, took a one to two hour nap daily sometimes, paid some bills, did therapy exercises and tried to go for walks.  (Tr. 225).  Plaintiff had difficulty vacuuming, could only clean in small intervals, and could only feed the animals in small amounts.  (Tr. 226).  Plaintiff needed to do chores and household cleaning in small intervals.  (Tr. 226).  When plaintiff attempted to return to work in a light duty capacity, her employer would not allow her to work with any physical restrictions. (Tr. 227).

Plaintiff's husband completed a third party function report on March 7, 2004. (Tr. 228-236).  Plaintiff's husband indicated that plaintiff did household chores and went to doctor appointments during the day, and rested when her pain was bad.  (Tr. 228). Plaintiff fed, groomed, trained, and cleaned litter boxes of pets and other animals. (Tr. 229).  Plaintiff's husband did the heavy chores for the animals.  (Tr. 229).  Prior to the impairment, plaintiff did some of the heavy chores, drove tractors, fished from a boat, snowmobiled, showed horses, and worked as a registered nurse.  (Tr. 229).

Plaintiff's sleep was affected by pain in her neck and shoulders, which kept her awake.  (Tr. 229).  Plaintiff prepared meals daily, but had difficulty stirring and lifting heavy pans and dishes.  (Tr. 230).  Plaintiff was able to do laundry and cleaning,

ironing, mowing with the riding law mower, some raking and gardening, and pushing snow off the deck.  (Tr. 230).  Plaintiff required help lifting and carrying heavier things during house and yard work.  (Tr. 230).  Plaintiff's husband indicated that she went outside frequently, that she walked, drove a car, rode in a car, and that she could go out alone.  (Tr. 231).  Plaintiff drove, but could not go for long periods of time.  (Tr. 231).  Plaintiff shopped for groceries, clothes, animal feed, farm supplies and medicine, and shopped two to three times per week outside of the home.  (Tr. 231).  Plaintiff was able to handle money.  (Tr. 231-232).

Plaintiff's hobbies and interests were reading, television, horses, farming, gardening, fishing, cross country skiing, carpentry and crafts.  (Tr. 232).  Since the impairment, plaintiff could not do these things as often, could not fish in a boat or ride horses, could not show horses or put harnesses on them.  (Tr. 232).  Plaintiff's husband reported that she frequently spent time with others doing hobbies, talking, shopping, spending time with children and grandchildren, visiting and having lunch.  (Tr. 232).  Places plaintiff went included church, stores, rummage sales, horse shows, fairs, and her relatives' homes.  (Tr. 232).  Plaintiff did not need to be accompanied to go places and did not have trouble getting along with people.  (Tr. 232).

Since the impairment, plaintiff could not do physical social activities as well as before.  (Tr. 233).  Plaintiff's husband noted that her impairment affected her ability to lift, reach, sit, use her hands and complete tasks.  (Tr. 233).  Plaintiff could finish what she started unless the pain was too bad, and could follow written and spoken instructions very well.  (Tr. 233).  Plaintiff handled stress very well and handled changes in routine very well.  (Tr. 234).

On October 28, 2004, plaintiff submitted a function report.  (Tr. 152-160). In this report, plaintiff stated that she took a bath instead of a shower because she had difficulty bending over to wash her lower extremities due to her pain, and that she sits down to get dressed because she is unable to bend over to pull up her pants due to the pain. (Tr. 152).  Plaintiff also stated that she used to feed the animals on her farm every day, but that after the accident, she relied on her husband to feed the animals. (Tr. 152).  Furthermore, plaintiff stated she had trouble styling her hair because she could not lift her arms over her head for any length of time, and that she prepared quick meals because she could not stand on her feet for any length of time.  (Tr. 153-154). Regarding house and chores, plaintiff stated that she had difficulty completing her chores because she had to take frequent breaks to rest because of pain.  (Tr. 154). Plaintiff also reported that she was unable to drive for prolonged periods of time due to pain, and that she was unable to turn her head from side to side to check for traffic. (Tr. 155).  Plaintiff stated that she shopped at a grocery store where they loaded her bags into her car for her because she could not lift heavy objects, and she leaned on the cart for support because she was unable to walk for any length of time due to back and neck pain.  (Tr. 155).  Plaintiff stated that she was unable to squat, bend or stand for any length of time, had difficulty reaching, was unable to sit for any length of time, and was unable to kneel.  (Tr. 157-158).  Plaintiff dropped things due to lack of grip strength in her right hand.  (Tr. 158).

On February 18, 2005, plaintiff submitted a disability report appeal in which she indicated that there were days when she has too much pain and did not shower or take care of her personal needs.  (Tr. 175).  Plaintiff further stated that she drove short distances and only when necessary; that household chores took her a long time to

complete because she took frequent breaks; that her husband did much of the shopping and if she did it, she needed assistance loading the bags into the car; and that she could not spend any amount of time on the computer or read the newspaper all at once. (Tr. 175).

On May 18, 2005, plaintiff again updated her disability report appeal and noted that she was no longer able to prepare complex meals due to intense fatigue, and that she struggled while taking items out of the oven; she attempted to complete light household chores but they took her much longer due to increased pain; she only drove short distances and preferred that someone else drive her; and she relied on her husband to accompany her to the grocery store.  (Tr. 184).  She further stated that she no longer visited with friends and family as much as she once did, and that she was unable to remain on the phone for any length of time due to pain in her neck.  (Tr. 186).

### 5.   VE's Testimony

At the hearing on August 31, 2006, Vocational Expert ("VE") Warren Haagenson also testified.  (Tr. 465).  The ALJ presented the VE with the following hypothetical:

> I'd like you to assume that you had a hypothetical woman with the same educational and vocational background as Ms. Larson with severe impairments of degenerative disc disease of the cervical spine, a cervical strain secondary to a motor vehicle accident, and left shoulder rotator cuff disease, status post left surgical repair of the left shoulder, and chronic pain syndrome, depression, degenerative joint disease of the left knee, status post arthroscopy of the left knee.  Well, with this combination of severe impairments limiting that woman to, well, work at the light level as defined by the Dictionary of Occupational Titles with occasional climbing of stairs or ramps, balancing, stooping, and kneeling, limited to occasional crouching or crawling, with no exposure to heights or unprotected heights or dangerous moving machinery as a result of medication side effects, with no constant fine or gross manipulation, and only occasional overhead reaching, no constant neck rotation, flexion or extension, and the work would be limited to unskilled work of an entry level nature with brief and superficial contact with the public and supervisors.

(Tr. 466).

59

The VE ruled out all of plaintiff's past work based on that hypothetical, but identified some light unskilled work that a person could perform including parking lot attendant, amusement and recreation attendant.  (Tr. 466-467).   At the sedentary unskilled classification of work, the VE stated that representative examples of jobs a person could perform with plaintiff's limitations included charge account clerk and food and beverage order clerk.  (Tr. 467).   When the ALJ further limited the residual functional capacity to the sedentary level as defined by the Dictionary of Occupational Titles and everything else remained the same, the VE testified that the jobs of charge account and food and beverage clerk would still remain.  (Tr. 467).   When the ALJ further limited the residual functional capacity at the sedentary level to require a sit/stand option at will, the VE opined that plaintiff could not perform the jobs of charge account and food and beverage clerk because they required a person to maintain one position for up to 30 minutes to be able to stay on task.  (Tr. 468).

Plaintiff's representative then asked the VE if plaintiff would be able to do any jobs under Dr. MacLean's evaluation where plaintiff could sit, stand and walk less than an hour each; was required to alternate sitting and standing throughout the day; no repetitive motion tasks to the upper extremities and no pushing and pulling of the upper extremities was permitted; occasional lifting of only 0 to 20 pounds, nothing frequently; and plaintiff suffered from severe fatigue and pain on a moderate bases.  (Tr. 468-469). The VE stated that he could not identify any full-time competitive employment based on the factors of being able to sit, stand and walk less than an hour each and no repetitive motion of the upper extremities.  (Tr. 469).

B.      **The RFC Determination**

The ALJ determined that plaintiff had the residual functional capacity to perform light work or lift and carry 20 pounds occasionally and 10 pounds frequently; she could stand, walk or sit for 6 hours in an 8-hour workday; and occasionally stoop, kneel and reach overhead.  (Tr. 35).  She could not perform any crouching or crawling, working at unprotected heights or with dangerous moving machinery, nor could she perform constant fine or gross manipulation, or constant neck, flexion, rotation or extension.  (Tr. 35).  With regard to mental limitations, plaintiff was limited to brief and superficial contact with the public, co-workers and supervisors and was limited to unskilled, entry-level work.  (Tr. 35).

1.      **Credibility Finding**

Plaintiff argued that the ALJ's credibility finding was not supported by substantial evidence in the record as a whole.  Pl. Mem. in Support, p. 28.  Plaintiff also contended that in making this finding, the ALJ failed to consider all of the factors required under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Pl. Mem., p. 34.

The ALJ found that "[c]ontrary to her allegations [of subjective pain], the claimant's subjective complaints are materially inconsistent with her reported activities, which include gardening, feeding animals, walking her dogs, washing the dishes, vacuuming, cooking, spending time with her family, shopping and going to church (Exhibit 11F, pp. 5 and 15; Exhibit 18E, p. 6; Exhibit 19E, p. 5)."  (Tr. 36).  The ALJ further noted that plaintiff traveled to horse shows in Minnesota and Iowa, and that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 36).

In reaching his decision, the ALJ gave very little weight to the opinion of Dr. MacLean, plaintiff's treating doctor, because it was inconsistent with plaintiff's activities of daily living and the medical record.  (Tr. 36).

Plaintiff challenged the ALJ's evaluation of her subjective complaints on several grounds.  First, as to the ALJ's reliance on the two treatment notes by Dr. MacLean dated December 4, 2002 and December 16, 2004, (Exhibit 11F, pp. 5 and 15 at Tr. 346, 356), plaintiff maintained that the first note was made shortly after her accident when plaintiff was trying to be as active as possible, and the second note was made right after plaintiff had completed radio frequency ablation.  See Pl. Mem., pp. 29-30.  Plaintiff maintained that these notations were atypical and isolated instances of improvement over a four-year period, and that it was unreasonable for the ALJ to reject Dr. MacLean's opinions and find plaintiff not credible based on these two records.  Id.

Next, to the extent that the ALJ was relying on activity questionnaires submitted by plaintiff and her husband (Exhibit 18E, p. 6; Exhibit 19E, p. 5 at Tr. 222-236), plaintiff argued that these forms only portrayed a person who was active before her accident and was trying to do what she could, but they did not establish that she could sustain work activity or work in excess of the limitations set by Dr. MacLean.  See Pl. Mem., p. 31.

Then pointing to the Polaski factors, plaintiff asserted that the objective record supported severe impairment, as did her work history, use of medications, the effects of any sort of sustained activity, and the opinions of her doctors, and these were all factors that the ALJ had failed to address.  See Pl. Mem., pp. 32-34.

Failure to give some consideration to a claimant's subjective complaints is reversible error.  Brand v. Secretary of the Dept. of Health, Educ. and Welfare, 623 F.2d

523, 525 (8th Cir. 1980).  "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding."  Id.  An ALJ must consider a claimant's subjective complaints, regardless of whether they are corroborated by objective medical findings.  Id.; see also Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991).  On the other hand, "we will not substitute our opinions for that of the ALJ, who is in a better position to assess a claimant's credibility."  Id. (citing Woolf, 3 F.3d at 1213).

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1.     the claimant's daily activities;

2.     the duration, frequency, and intensity of the pain;

3.     precipitating and aggravating factors;

4.     dosage, effectiveness, and side effects of medication; and

5.     functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  Cox, 160 F.3d at 1207.  The ALJ must take into account, but does not need to discuss how each factor relates to plaintiff's credibility.  Id. (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson, 87 F.3d at 1017 (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).  "The ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 207.  If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations." Cline, 939 F.2d at 565.  On the other hand, the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.  See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies between the claimant's statements and evidence in the record); see also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of plaintiff's subjective complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).  When a claimant's condition is successfully treated

or responsive to medication, her subjective complaints concerning the severity of her condition may not be credible.  Johnston v. Apfel, 210 F.3d 870, 875 (8th Cir. 2000).

Although a claimant need not establish that she is bedridden to be disabled, her credibility regarding subjective complaints of pain can be undermined by daily activities. See Haley v. Massanari, 258 F. 3d 742, 748 (8th Cir. 2001) (finding inconsistencies between subjective complaints of pain and daily living patterns where claimant could care for personal needs, wash dishes, change sheets, vacuum, wash cars, shop, cook, pay bills, drive, attend church, watch television, listen to the radio, visit friends and relatives, read and work on the construction of his home); Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (finding that claimant's ability to cook some meals, water the flowers around his house, help his wife paint, watch television, go out for dinner, occasionally drive an automobile, and occasionally visit with friends, did not support a finding of total disability); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (concluding that the credibility of claimant's allegations of disabling pain was undermined by his daily activities, including caring for children, driving, and occasional grocery shopping).

On the other hand, "[t]o find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  Therefore, "'the ability to do activities such as light housework and visiting with friends [may provide] little or no support for the finding that a claimant can perform full-time competitive work.'"  Baumgarten, 75 F.3d at 369; see also, e.g., Harris v. Sec'y of the Dep't of Health and Human Servs., 959 F.2d 723, 726 (8th Cir. 1992) (same); Thomas, 876 F.2d at 669 (same); Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir.

1995) (same).  See also Tang v. Apfel, 205 F.3d 1084, 1086 (8th Cir. 2000) (where plaintiff described his activities of daily living as starting his day at 6:30 a.m., getting the children ready for school, and going to bed at approximately 9:00 p.m., and also stated he could no longer ride his bike, play ball, shovel snow, take out the garbage, or mow his lawn but he was still able to climb stairs and did the laundry, court found that plaintiff's ability to engage in such domestic activities provided scant evidence of his ability to perform full-time work); Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998) ("We find that [plaintiff's] daily activities are also consistent with her complaints of disabling pain. Uncontroverted evidence shows that [plaintiff] is unable to perform many of the daily activities she once enjoyed. She testified that although she is able to take care of her daily needs, she needs help with housework and shopping."); Eback v. Chater, 94 F.3d 410, 413 (8th Cir. 1996) (where plaintiff was taking care of her personal needs; sharing responsibility with her husband for the care of her 19-month-old child; sharing cooking and house cleaning responsibilities with her husband; frequently driving to visit family members who live 1.5 miles away; and attending bingo on a fairly consistent basis prior to 1993, court found that none of these activities supported ALJ's conclusion that plaintiff could do full-time work in the competitive local or national economy).

The Court agrees with plaintiff that the ALJ did not properly assess her subjective complaints of pain.  While the two reports by Dr. MacLean in December 2002 and December 2004 indicated that plaintiff had engaged in such activities as carrying a 10-25 pound bucket of grain, reading, doing laundry, vacuuming, and gardening, at the same time these records reflected that these very same activities caused weakness,

increased pain and spasms. (Tr. 346, 355-56).  The ALJ made no mention of the effects of these various activities reported by Dr. MacLean in these very same records.

As to the activities of daily living questionnaires relied upon by the ALJ, the Court notes that they date back to March of 2004.  Since that time there is an abundance of information in the record regarding plaintiff's daily living activities that is consistent with plaintiff's complaints of pain, including plaintiff's function report, appeals and reports of daily activities to various medical providers, which the ALJ did not discuss at all.  See e.g. Function Report dated October 28, 2004 (Tr. 152-158); Disability Report Appeal dated February 18, 2005 (Tr. 169-177); Disability Report Appeal dated May 18, 2005 (Tr. 178-186); (Tr. 428); Letter by Dr. Fleeson dated December 8, 2005 (Tr. 388-89). These later records support plaintiff's contention that her condition worsened with time, and that she could not engage in the most basic activities without pain, spasm, tenderness, fatigue and discomfort.

Given the wealth of information after March of 2004 regarding plaintiff's daily activities that is not addressed by the ALJ, the Court finds that the ALJ improperly discredited plaintiff's complaints on this basis.  See Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995) ("We also conclude that the ALJ improperly relied on the August and September 1990 medical progress notes to discredit Frankl's complaints of fatigue to the exclusion of subsequent medical, nonmedical, and testimonial evidence that was consistent with Frankl's complaints of fatigue at the time of the hearing, over a year later."); Morse v. Shalala, 32 F.3d 1228, 1230-31 (8th Cir. 1994) (reversing a finding of not disabled where the ALJ relied on an old medical report and gave no weight to subsequent evidence supporting plaintiff's claim, including the treating physician's progress notes that indicated continued pain consistent with the claimant's subjective

67

complaints).  If the plaintiff's descriptions of her daily activities are to be rejected, then the ALJ must explain why he only analyzed and accepted the descriptions of her activities in 2002 and 2004, and never mentioned, much less discussed, the basis for rejecting her later descriptions, including those at trial, in order to find that her daily activities were inconsistent with her claim of total disability.  Without this explanation by the ALJ, this Court's review of the entire record as a whole, supports plaintiff's claims that she cannot engage in competitive employment on a full-time basis, day-in-and-day-out.

Additionally, the Court agrees with plaintiff that the ALJ did not fully consider all of the required factors under Polaski.  Specifically, the ALJ failed to mention or discuss the duration, frequency, and intensity of plaintiff's pain; any precipitating and aggravating factors; and the dosage, effectiveness and side effects of medication – all matters that were addressed in the medical records.  For example, at varying times, plaintiff had taken no less than five different types of pain killers, all of which caused side effects such as nausea, stomach pain, wooziness, and the possibility of addiction, which the ALJ never acknowledged or discussed.  (Tr. 344, 360, 428).  Similarly, while the ALJ focused on activities performed by plaintiff that he found to be inconsistent with complete disability, he never addressed the impact of such activities on plaintiff.  See e.g. Tr. 252 (discussing effects of restriction testing on plaintiff in October 2003); see also Tr. 248, 252, 253, 257, 266, 277, 281, 344, 346, 353, 356, 359, 399, 428.

Moreover, the ALJ only considered the records of two examining medical providers, that of Dr. Himanago from September 2002, who saw plaintiff on one

occasion at the request of Dr. MacLean, and one record from Dr. Erlemeier,[56] dated November 22, 2002, a neurologist who also saw plaintiff only once.  (Tr. 249).  The ALJ never mentioned or analyzed the lengthy set of records from Dr. MacLean, or the findings or opinions of doctors, physical therapists and chiropractors who examined or treated plaintiff during the four years before the hearing.

Taken as a whole, as the record now stands, it does not discredit plaintiff's complaints of pain.  In Singh v. Apfel, the Eighth Circuit found that the record did not justify the rejection of the plaintiff's complaints of disabling pain where it showed repeated and consistent visits to doctors, plaintiff had taken numerous prescription medications, and had availed himself of many pain treatment modalities including chiropractic treatments, nerve blocks, a TENS unit, and has undergone surgery and many diagnostic tests.  222 F.3d 448, 453 (8th Cir. 2000).  The record is similarly replete here – plaintiff has been seeing doctors frequently since the date of her car accident, including specialists.  Plaintiff has also explored chiropractic care and physical therapy, and seen specialists to whom she was referred.  Plaintiff underwent rotator cuff surgery, nerve blocks, cortisone injections and rhizotomies in an effort to relieve her pain.  She has used a TENS unit, home traction and other stimulators, and has had MRI scans.  Plaintiff has taken a plethora of medications (many of which caused her side effects and were discontinued), and performed her therapy exercises pursuant to doctor's orders.  There is nothing in the record suggesting that she was ever malingering.  Lacking further analysis and explanation by the ALJ, this record does not justify the rejection of plaintiff's subjective complaints of pain.

---

[56]     The Court notes that this opinion is the opinion of Dr. Erlemeier, not Dr. Tomanek as cited by the ALJ.  (Tr. 36, 282, also referred to as Exhibit 4F, p. 14).

Accordingly, this Court recommends that the case be remanded to the ALJ to properly analyze plaintiff's subjective claims of disabling pain based on all of the Polaski criteria.  In the event he rejects plaintiff's subjective claims of pain – taking into account the entire record regarding medical treatment; plaintiff's daily activities; the duration, frequency, and intensity of plaintiff's pain; the precipitating and aggravating factors of her complaints; and the side effects of pain medications – he should detail his reasons for discrediting the testimony and records for each factor.

### 2.   Weight of Treating Physician's Opinion

On July 25, 2005, Dr. MacLean prepared a functional capacity evaluation in which she opined that plaintiff could not sit or stand and walk for more than one hour at a time, and that she could never balance, stoop, crouch, crawl, reach above shoulder level, work at unprotected heights or around moving machinery or drive automotive equipment.  (Tr. 373-75).  Plaintiff argued that the ALJ erred in not according controlling weight to Dr. MacLean's opinion.

Relying on the opinions of Drs. Himango, Erlemeier, Salmi and Wolfe, none of whom are treating physicians, the ALJ stated that "the undersigned does not accord controlling weight to Dr. MacLean's opinion, and gives the opinion little weight overall. Dr. MacLean's opinion is entirely inconsistent with the claimant's reported activities of daily living and with the medical evidence of record.   Furthermore, Dr. MacLean's opinion that the claimant cannot sustain full-time work on a regular basis is an issue reserved to the Commissioner of Social Security."  (Tr. 36).  In reaching his decision, the ALJ also appeared to rely on a functional capacity evaluation completed by physical therapist Kittelson in 2003, and discounted the restrictive functional evaluation by

Dr. Fleeson in 2006 because it was without substantial support from the other evidence in the record.  (Tr. 36-37).

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'"  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)).  Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527.  In according weight to medical opinions, the ALJ should consider the following factors: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well-supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in the record."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); 20 C.F.R. § 404.1527(d)(2)).  Absent these two requirements, the ALJ need not accord controlling weight to a treating physician's opinion and the ALJ may not give a treating physician's opinion controlling weight based solely on the fact that he or she is a treating physician.  Prosch, 201 R.3d at 1013.  "[T]he value of a medical source's opinion is found in 'judgments about the nature and severity' of a claimant's impairments; a medical source's conclusions that a claimant is 'disabled' or 'unable to work' are 'not give[n] any special significance' because such dispositive

findings are reserved to the ALJ."  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (quoting 20 C.F.R. § 404.1527(a)(2) & (e)(1),(3)).

Based on the various factors discussed above, including the length, nature, and extent of the treatment relationship between Dr. MacLean and plaintiff, the quantity of evidence in support of Dr. MacLean's opinion, and the consistency of that opinion with the record as a whole, this Court finds that the grounds articulated by the ALJ for refusing to give controlling weight to Dr. MacLean's functional capacity evaluation were not supported by substantial evidence in the record as a whole.

Dr. MacLean was plaintiff's primary physician and had been treating plaintiff regularly after the motor vehicle accident.  The nature of Dr. MacLean's treatment covered plaintiff's pain control as well as her mental health status.  Dr. MacLean referred plaintiff to physical therapy as well as to several specialists in an effort to resolve plaintiff's health problems.  Dr. MacLean received reports from referral doctors, and was fully aware of plaintiff's medical condition.  Thus, the nature and extent of the treating relationship between plaintiff and Dr. MacLean support giving her opinions significant weight.

Nevertheless, despite this long relationship between plaintiff and Dr. MacLean, the ALJ chose to rely on the opinions of Drs. Himango, Erlemeier, Wolfe and Salmi and physical therapist Kittleson for plaintiff's RFC.  The records indicate that Dr. Himango and Dr. Erlemeier each saw plaintiff once in 2002, and Drs. Wolfe and Salmi never examined plaintiff.  As such, their opinions do not constitute substantial evidence.  "[A treating physician's opinion] should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  By contrast, '[t]he opinion

of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'"   Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).   Further, under the applicable regulations, a functional capacity evaluation done by a physical therapist is not accorded the same weight as a treating physician's opinions.   See 20 CFR § 404.1513 (listing acceptable medical sources who can provide evidence to establish an impairment).

Additionally, Dr. Himango's opinion in September 2002 that plaintiff's gait, heel to toe walking and lumbar and cervical ranges of motion were normal, and Dr. Tomanek's (Dr. Erlemeier's) opinion in November 2002 that plaintiff showed normal strength, bulk and tone in all four extremities were based on one-time examinations made shortly after plaintiff's car accident.   Neither physician ever saw plaintiff again.   Lacking any explanation from the ALJ as to why he placed greater significance on these two early examinations by non-treating physicians, or what it was about the balance of the record over the next four years leading up the hearing in 2006 that was consistent with their opinions, the Court has no basis for concluding that his decision to reject Dr. MacLean's evaluation is supported by the record as a whole.

Similarly, to the extent that the ALJ relied on the functional evaluation of physical therapist Kittleson in 2003, and the assessments in 2004 by Drs. Wolfe and Salmi in making his RFC determination, he did not point to any diagnoses or observations in the record that supported their assessments.   Further, the ALJ's explanation for rejecting the later assessment by Dr. Fleeson is belied by the evidence in the record.   The ALJ stated he was rejecting Dr. Fleeson's restrictive physical functional evaluation because it was "without substantial support from other evidence in the record," and because

Dr. Fleeson relied "quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true, most, if not all, of what" she reported.   (Tr. 37).   Yet, the ALJ never identified any evidence from the record to support his statement that Dr. Fleeson's opinion was without substantial support  More importantly, however, a review of Dr. Fleeson's 17-page report indicated that his opinions were based on not only his interview of plaintiff, but a physical examination of her spine, shoulders, neck, and hands, analysis of current x-rays taken by him, and a review of approximately 200 pages of medical reports from the various providers, including past MRIs.  (Tr. 386-97).   The physical examination by Dr. Fleeson revealed numerous objective findings that were consistent with plaintiff's complaints of disabling pain including: tenderness in the thoracic and cervical spine, the base of the head and the bilateral posterior neck areas; diffuse and quite dramatic muscle spasms over the right and left shoulder girdle and trapezius areas; all of these areas were found to be quite tender, and consistent with trigger points; the range of motion in the neck showed very decreased neck motion in flexion; the lateral bend and rotation were one-third to one-half of normal and produced pain in the neck and trapezius; the cervical spine motion against resistance produced posterior neck pain and pain in the left upper lateral chest region near the clavicle; and the shoulder examination showed stiffness. (Tr. 395).  In addition, the x-rays obtained by Dr. Fleeson of the cervical spine showed slight narrowing at C3-4, significant narrowing with near-loss of disc space at C5-6, and narrowing at C6-7 which was also moderate to severe.  (Tr. 396).

A fair examination of Dr. Fleeson's report does not support the ALJ's opinion that Dr. Fleeson merely relied on the subjective reports of pain and limitations by plaintiff.

Finally, a review of the medical record, including all of the records of Dr. MacLean, as a whole indicates that plaintiff's condition worsened over time, and was consistent with Dr. MacLean's opinion of plaintiff's work restrictions.  Dr. MacLean repeatedly noted throughout her treatment of plaintiff that plaintiff held her head stiffly and continued to have pain and palpable tenderness.  (Tr. 344, 346, 352, 353, 356, 358, 363, 429).  The treating medical professionals at Superior Health Medical Group and Dr. Tomanek also continuously noted plaintiff's complaints of spasms or significant or severe pain.  (Tr. 251, 252, 253, 256, 257, 263, 360).  Plaintiff's ongoing pain was noted by Dr. Erlemeier (Tr. 281), physical therapist Dick Eilert (Tr. 399-400, 407), Dr. Butcher (Tr. 271, 274, 275, 277), and Dr. Nelson (Tr. 308, 311).  Plaintiff's physical examinations by Dr. Butcher repeatedly showed tenderness to palpation as well.  (Tr. 270, 271, 274, 275).

Plaintiff's MRI scans also provided objective evidence of the severity of plaintiff's condition.  On August 22, 2002, plaintiff had an MRI of her cervical spine.  (Tr. 365-366).  Dr. Ekberg concluded the plaintiff had severe central canal and intervertebral canal stenosis at the C6-7 level with cord flattening, as well as bilaterally stenotic intervertebral canals on the basis of end plate spurring, broad-based nuclear herniation, and bilateral uncinate spurs; Dr. Ekberg also determined that plaintiff had moderate to severe central canal stenosis at C5-6 with end plate spurs, uncinate spurs, and broad-based nuclear herniation, with moderate cord flattening with moderate to severe central canal stenosis; there was also moderate central canal stenosis at C3-4 with mild flattening of the cord.  (Tr. 366).

The record further established that plaintiff's symptoms and the impact on her activities worsened over time.  On July 11, 2003, Dr. MacLean noted that plaintiff

believed she had continued to gradually improve, although she continued to have severe spasms and sharp shooting pains in the back of her neck whenever she looks down. (Tr. 353). She also reported she was only able to perform minimal gardening, for a maximum of one hour, before she experienced increased pain in her neck. (Tr. 353). She was no longer feeding horses, and when she was on jury duty she noticed severe pain in her neck after sitting two hours, taking a short break, sitting for another two hours and then having lunch. (Tr. 353). Following the functional capacity evaluation by Kittleson in October 2003, plaintiff was totally restricted in her activities. (Tr. 252). On December 16, 2004, plaintiff indicated to Dr. MacLean that as she increased her activities on the farm, around the house and with her garden, she seemed to suffer at night with increased pain. (Tr. 346). On June 7, 2005, plaintiff reported to Dr. MacLean that she continued to have significant difficulty with many activities, she had severe stabbing pain between her shoulder blades and lower in her back, and if she stayed with one activity for more than 20 minutes, the pain was worse. (Tr. 344). On December 8, 2005, she shared with Dr. Fleeson the difficulty she had and discomfort she experienced using the phone, folding clothes, and performing other minor activities. (Tr. 388). She also indicated that she was unable to get comfortable during the night, and there were a large number of tasks and activities in which she could no longer participate, including ironing, baking, carrying feed, sewing, driving, fishing, and riding horses. (Tr. 388-389). Plaintiff reported more or less constant spasms, pain, and symptomatolgy in her peri-scapular musculature and mid-to-low spine. (Tr. 388). On January 25, 2006, plaintiff reported to Dr. MacLean the difficulty she was having with routine activities of daily living. For example, she could only read for five minutes at a time and had difficulty with sewing and folding clothes. (Tr. 428). On July 20, 2006,

plaintiff had noticed worsening of spasms in her neck, poor sleep, shoulder pain and burning pains. (Tr. 422). On August 30, 2006, Dr. MacLean wrote a prescriptive note stating that plaintiff continued to unable to work and remained totally and permanently disabled due to her neck injury. (Tr. 440).

Dr. MacLean treated plaintiff for a significant period of time and continuously from the time of the accident in June 2002 to after the hearing in August 2006. While her opinion of plaintiff's ability to work is restrictive, it is both consistent with and supported by the substantial evidence in the record. The record does not support giving Dr. MacLean's opinion less weight than the physicians who saw plaintiff on a limited basis in 2002 or not at all. Accordingly, the case should be remanded for consideration of plaintiff's claim that she cannot perform any gainful employment based on the appropriate weight to be assigned to Dr. MacLean's opinions.

### 3.     Impact of Records Submitted to Appeals Council

On June 22, 2007, plaintiff sent a Request and Remand to the Appeals Council due to New and Material Evidence, and included medical evidence dating after the date of the hearing before the ALJ. (Tr. 10-14, 471-493). On July 13, 2007, the Appeals Council denied plaintiff's request, finding that the time for reopening the case had expired, and that the new evidence submitted with the request was not material because it was repetitious of evidence already in the record. (Tr. 6).

The regulations, 20 C.F.R. § 404.970(b), provide that the Appeals Council must consider evidence submitted with a request for review if it is "'(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000) (citing Box v. Shalala, 52 F.3d 168, 171 (8th Cir.1995) (quoting Williams v. Sullivan, 905 F.2d 214, 216-17 (8th Cir.1990));

Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007). Assuming the new evidence meets these criteria, the court's role is to determine whether the ALJ's decision is supported by the record as a whole, including the evidence submitted to the Appeals Council after the determination was made. See Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). Thus, the court considers how the ALJ would have weighed the new evidence had it existed at the hearing. See Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994).

The new evidence included medical records from Dr. MacLean from August 30, 2006 through April 3, 2007. These records established that plaintiff continued to have severe pain which caused her difficulty, ongoing tenderness, and that she had notice no significant improvement in her neck pain (Tr. 488, 490, 491, 493). The new evidence contained updated MRIs. On October 4, 2006, Dr. MacLean ordered a repeat MRI of the cervical and thoracic spines. (Tr. 492). The cervical MRI revealed moderately advanced degenerative changes at C6-7, C5-6 and C3-4. (Tr. 471). The thoracic MRI revealed mild degenerative changes in the mid thoracic spine, with mild ventral annular thickening on the left at T7-8 and moderate degenerative change involving the right T9-10 facet. (Tr. 473).

The new evidence also included another opinion from Dr. MacLean dated April 3, 2007, regarding plaintiff's functional impairments, which was even more restrictive than the earlier opinion that had been rejected by the ALJ. In support of this April 2007 opinion, Dr. MacLean stated that while plaintiff managed to brush her own hair, she tended to lose her grasp when holding things; plaintiff had noticed ongoing right hand and arm weakness at times; and she was unable to perform desk-type activities as she was unable to have her head looking down for more than five minutes at a time.

(Tr. 487).   Plaintiff could not perform any computer work, and had difficulties folding clothes and performing paperwork.  (Tr. 487).  Dr. MacLean also stated that plaintiff was currently undergoing counseling regarding severe grief reaction due to loss of ability to perform routine tasks and due to chronic pain syndrome.  (Tr. 479).

In addition, the newly submitted evidence included a report from Carina Barker, LICSW, at St. Luke's Mental Health Services, who saw plaintiff on November 21, 2006 for a psychological assessment, and then ongoing therapy.  (Tr. 474-478).  At the initial assessment, Barker diagnosed plaintiff with recurrent major depressive disorder and post-traumatic stress disorder and assigned plaintiff a GAF score of 53, (Tr. 476), which signifies "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, p. 34 (4th ed. 2000 Revision).  Plaintiff had several more sessions with Barker, during which she was treated for her depression.  (Tr. 477, 478).  The record also contains Dr. MacLean's notes regarding plaintiff's treatment for depression from February to April of 2007.  (Tr. 487, 488, 490).

Finally, the newly submitted evidence contained the opinion of Dr. Donley, a neurosurgeon, who had previously reviewed plaintiff's records at the request of Dr. Tomanek in 2003 to determine if plaintiff was a candidate for surgery.  (Tr. 259, 354).  Dr. Donley saw plaintiff on March 15, 2007, on referral by Dr. MacLean and Dr. Nelson.   Dr. Donley informed plaintiff that she has failed all percutaneous approaches, and that he would not recommend any further neck cervical spine blocks. (Tr. 481).  Dr. Donley indicated that "as things failed," he would consider doing a fusion of the C3 and C4 level and decompressing the anterior cord.  (Tr. 481).  Dr. Donley

diagnosed plaintiff cervical spondylosis on multiple levels with chronic neck pain and headaches.  (Tr. 481).  Following the examination, Dr. Donley sent Dr. MacLean a note on March 15, 2007 saying that he would "sit tight and go conservative."  (Tr. 482).

The Court finds that the additional records constitute new and material evidence. "To be new, evidence must be more than merely cumulative of other evidence in the record.  To be material, the evidence must be relevant to claimant's condition for the time period for which benefits were denied."  Bergmann, 207 F.3d at 1069 (citations omitted).  Here, the additional records described deterioration in plaintiff's physical and mental condition, both before and after the date of the ALJ's decision.  "[T]o qualify as material, the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition."  Id. at 1069-1070.  Nonetheless, the Eighth Circuit found in Bergmann that medical records from a treating physician subsequent to the date of the hearing were material because "although it involves deterioration, that deterioration occurred over the course of [the treating physician's] treatment, specifically including the time period before the ALJ."  Id. at 1070.  The same is true here – Dr. MacLean's treatment notes subsequent to the hearing document plaintiff's deterioration over the course of Dr. MacLean's treatment of plaintiff. Dr. MacLean's most recent opinion noted that plaintiff's pain was getting worse, and she consequently assigned plaintiff a reduced functional capacity consistent with plaintiff's deterioration.

Furthermore, the updated MRIs contained findings of moderately advanced degenerative changes.  In addition, while Dr. Donley did not opine as to plaintiff's ability to work, he diagnosed plaintiff with cervical spondylosis on multiple levels with chronic neck pain, which is consistent with the rest of the record.

All of this new evidence supported the credibility of plaintiff's subjective complaints of disabling pain, in that pain and tenderness continued to be noted during her physical examinations, while at the same time, these records were silent as to the types of daily activities that the ALJ had found to be inconsistent with plaintiff's claims.

Finally, the records from therapist Barker, coupled with Dr. MacLean's notes, indicated that plaintiff's mental condition had significantly worsened from the mental status examination performed by Dr. Wagner in November 2004 (Tr. 289-93), or the mental residual functional capacity assessment issued by state agency physician, Dr. Larson that same month. (Tr. 314-332).

The Court concludes that if the ALJ had all of this information and had he accorded the proper weight to Dr. MacLean's opinions, his decision was not supported by the record as a whole. Accordingly, because this Court is recommending that this case be remanded back to the ALJ for further determinations consistent with this opinion, it concludes that the ALJ should also be required to consider the additional information submitted by plaintiff to the Appeals Council.

### 4.    Hypothetical Presented to the VE

The parties do not dispute that plaintiff cannot perform her past relevant work. Thus, the burden shifts to the Commissioner to prove that she can do other types of work within her residual functional capacity, and that such work exists in significant numbers in the national economy. Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005). Plaintiff argued the vocational expert's testimony is insufficient to constitute substantial evidence supporting the ALJ's decision because the hypothetical question posed to the expert did not contain all of plaintiff's impairments and limitations. Pl. Mem., p. 38.

The hypothetical question need only contain those limitations accepted by the ALJ as true.  Rappaport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).  Testimony from a vocational expert, which was based on a properly phrased hypothetical question, constitutes substantial evidence supporting the ALJ's decision.  Id.  "However, where an ALJ improperly rejects the opinion of a treating physician or subjective complaints of pain by the claimant, the vocational expert's testimony that jobs exist for the claimant does not constitute substantial evidence on the record as a whole where the vocational expert's testimony does not reflect the improperly rejected evidence."  Wiekamp v. Apfel, 116 F.Supp.2d 1056, 1074 (N.D.Iowa 2000) (citing Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000).

Here, the hypothetical questions posed to the VE were inextricably intertwined with the ALJ's determination of plaintiff's RFC and findings as to her credibility. Therefore, because the hypothetical questions posed to the vocational expert were based upon a faulty determination of plaintiff's RFC, the vocational expert's answers to those questions cannot constitute sufficient evidence that plaintiff was able to engage in substantial gainful employment.  See Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998); see also Jenkins v. Apfel, 196 F.2d 922, 925 (8th Cir. 1999) (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion).  If the ALJ revises his final RFC determination upon remand, he should then solicit new testimony from a vocational expert in order to determine whether, at step five of the evaluation process, there are any jobs that plaintiff could perform given the ALJ's post-remand RFC determination.

## VI.   CONCLUSION

For the reasons discussed above, the Court concludes that the ALJ's decision to deny plaintiff's application for SSI benefits cannot be upheld.   Therefore, it is recommended that plaintiff's motion for summary judgment be granted in part and denied in part.   Plaintiff's request for an immediate award of benefits should be denied. However, the ALJ's decision should be vacated.   It is also recommended that the defendant's motion for summary judgment be denied, and that this case be remanded for further administrative proceedings.   On remand, the ALJ should be directed to do the following:

First, in conjunction with the entire record, he should determine plaintiff's RFC at step four by giving full consideration to all of the records from Dr. MacLean, including the records from Dr. MacLean submitted after the hearing, (Tr. 486-495), and also the records of other medical providers submitted after the hearing to the Appeals Council, (Tr. 471-485).

Second, if the ALJ still concludes, after considering the fully-developed medical record, that Dr. MacLean's opinions, the opinions of other treating physicians, and plaintiff's subjective complaints of disabling pain should be discounted, the ALJ should fully explain his position on those matters in light of the new record.

Finally, if the ALJ revises his final RFC determination, he should solicit new testimony from a vocational expert in order to determine whether, at step five of the evaluation process, there are any jobs that plaintiff could perform given the ALJ's post-remand RFC determination.

## RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.     Plaintiff's Motion for Summary Judgment [Docket No. 12] be granted in part, and denied in part;

2.     Defendant's Motion for Summary Judgment [Docket No. 15] be denied; and

3.     The case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.


Dated:        August 13, 2008

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before September 2, 2008 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.